**In re RONCO, INC., et al., Debtors.**

**No. 84 C 3229.**

United States District Court,
N.D. Illinois, E.D.

Dec. 11, 1984.

On Motion to Alter or Amend
Feb. 6, 1985.

Louis W. Levit, Richard J. Mason, Ira Goldberg, Levit & Mason, Ltd., Chicago, Ill., for petitioner.

Joseph G. Gavin, Joseph M. Russell, First Nat. Bank of Chicago, Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

In this appeal arising out of Chapter 11 reorganization proceedings, the Creditors' Committee ("Committee") of Ronco Teleproducts, Inc. ("Teleproducts") challenges a ruling (the "Decision") by then Bankruptcy Judge Richard Merrick[1] establishing the validity, priority and amount of liens held by First National Bank of Chicago ("FNB") and Wells Fargo Bank, N.A. (collectively "Banks") in the accounts receivable and

---

1. In fact the order appealed from was signed by Bankruptcy Judge Frederick Hertz. After Judge Merrick had conducted the hearings and stated his ruling, he was out of the city when the order was prepared by counsel and tendered for signature by Judge Hertz (then acting as Emergency Judge).

inventory of Ronco, Inc. ("Ronco") and certain other affiliated corporations (Teleproducts, Ronco and all the other affiliated corporations are collectively "Debtors"). Ronco and all other Debtors are wholly owned by Teleproducts.[2] For the reasons stated in this memorandum opinion and order, the Decision is affirmed.

### Facts

On January 17, 1984 three creditors filed an involuntary bankruptcy petition against Ronco under Chapter 7 of the Bankruptcy Code. On February 1 Ronco transformed the proceeding into a Chapter 11 reorganization when each of it and the other Debtors filed a voluntary petition under Chapter 11.

Meanwhile, in January Debtors had negotiated an agreement with Banks for post-petition financing of Debtors' business operations. At a February 3 hearing in Bankruptcy Court, Debtors moved for entry of an order approving the agreement, without which Debtors argued they would be forced to cease operations and all the Debtors (including Teleproducts) would fail (Feb. 3 [4 p.m.] Tr. 23). Attorneys for several creditors, including Louis Levit, Esq. ("Levit") of Levit & Mason on behalf of creditor SAFT America, Inc. ("SAFT"),[3] objected to entry of the order, principally because the proposed draft contained findings that Banks' liens in Debtors' inventory and accounts receivable had been perfected (Feb. 3 [10 a.m.] Tr. 38). Judge Merrick adjourned the February 3 morning hearing, and lawyers for all interested parties—Levit included—promptly negotiated more mu-

tually acceptable terms. Thus the revised version of the order tendered to and signed by Judge Merrick contained no finding as to the validity of Banks' liens, instead calling for that issue to be determined at a separate hearing (Feb. 3 [4 p.m.] Tr. 5).

On February 7 Judge Merrick set the lien hearing for February 24. Levit's partner Richard Mason, Esq. ("Mason") advised Judge Merrick he had no objection to setting the lien hearing for such a short date, as long as the hearing was restricted to the narrow question of lien perfection (Feb. 7 Tr. 13). All parties agreed to that narrow scope (Feb. 7 Tr. 12, 13).

On February 17, in response to a wide-ranging February 15 document request by Levit & Mason, Banks produced some documents relating to the perfection of liens (Banks Mem. 8 and App. B). Banks had already provided creditors (at the February 3 hearing) with documents evidencing the liens' attachment and perfection: notes, security agreements and financing statements (Banks Mem. 8). On February 22 FNB opened its credit file for Committee's and other creditors' inspection (*id.*).

One of the matters dealt with at the February 24 hearing (the "Hearing") was the appointment of Levit & Mason as counsel for the Committee. When the Hearing turned to its specifically-scheduled issue of perfection of Bank's liens (set, it will be recalled, with Mason's approval), Levit objected that he and Mason had not had an opportunity to prepare adequately and requested a continuance (Feb. 24 Tr. 47). Levit did not identify any document or source of information relevant to the nar-

---

**2.** Because the Committee comprises only Teleproducts' creditors, no creditors' committee having been established for Ronco itself, there is a question whether only Ronco's trustee—and not the Committee—has standing to bring this appeal. That has been the subject of full briefing by Committee and Banks. In addition the parties have written at some length on the standard of review applicable to the Bankruptcy Judge's decision, although in that respect the Committee has acknowledged this Court need not conduct a new hearing (Comm. Oct. 9 Mem. 7–8). This Court's determination on the merits of Banks' lien rights, as reflected in this opinion, renders unnecessary a resolution of either question ad-

verted to in this n. 2. Accordingly this opinion does not refer to the parties' earlier memoranda on that issue, and further references to the memoranda on the current question (filed October 9, October 23 and November 13) will simply take the form "Comm. Mem.—," "Banks Mem. —" and "Comm.R.Mem.—."

**3.** SAFT's representative became chairman of the Committee upon its formation, and Levit & Mason have been its counsel from the outset (though formally approved as such February 24).

row issue of lien perfection to which Levit & Mason had not had access.[4] Instead Levit argued he should have the opportunity to go on a "fishing expedition" through Ronco's huge files in search of any type of irregularity relating to security interests, including problems (such as fraudulent conveyances) not immediately at issue (Feb. 24 Tr. 67). In that last respect, it had already been agreed fraudulent conveyance or preference issues would be dealt with in the future, with the lien perfection issue to be decided without prejudice to such claims (Feb. 7 Tr. 13; Feb. 24 Tr. 67). Levit also stated incorrectly that Mason had objected to the hearing date when it was set (Feb. 24 Tr. 53).

No other creditor sought a continuance, and indeed Ronco's largest unsecured creditor, Altra Corporation, urged the Court to proceed with the Hearing (*id.* at 75). Altra represented (*id.*) it needed a prompt determination on liens to assess its posture in the case. Banks represented they were hesitant to lend operating funds to Debtors without knowing the validity of their liens. Judge Merrick had also expressed concern (Feb. 7 Tr. 16–17) over the anticipated March 31 lapse of bankruptcy courts' jurisdiction under the Emergency Rule.

Judge Merrick denied the continuance and proceeded with the hearing. Banks introduced a number of documents and put on a witness, Ronco executive Paul Hofman ("Hofman"), who testified as to the nature of Ronco's sales arrangements with its retailers, which the parties agree is the determinative factor as to lien perfection. At the end of the Hearing Judge Merrick stated he would rule the liens were valid and duly perfected. On February 29 Judge Hertz (sitting as Emergency Judge) entered the order now on appeal.

### Grounds (or Lack Thereof) for Appeal

On such an afternoon, some score of members of the High Court of Chancery bar ought to be—as here they are—mistily engaged in one of the ten thousand stages of an endless cause, tripping one another up on slippery precedents, groping knee-deep in technicalities, running their goat hair and horse-hair warded heads against walls of words, and making a pretense of equity with serious faces, as players might.[5]

This appeal surely finds its inspiration amid the dusty briefs of Dickens' Jarndyce and Jarndyce, for every lay person (or sensible lawyer, for that matter) would have some difficulty in understanding why it was brought. Any appellant might be expected to identify some error in the lower court's reasoning or some basis on which the lower court could have reached the opposite result. In 42 pages of memoranda,[6] however, Committee neither asserts the Decision's substantive *result* was incorrect nor suggests any real basis for a different result. Rather Committee says certain supposed procedural and evidentiary inadequacies or "peculiarities" should raise "concerns" for this Court. In fact not even surface merit attaches to any of Commit-

---

**4.** Levit & Mason had not launched their discovery request in preparation for the Hearing until February 15, when half of the time span between the February 7 setting of the Hearing date and the Hearing itself had already elapsed. Even then, rather than tailoring their document request to lien perfection issues, Levit & Mason requested (Banks Mem. 8) "all documents, correspondence, notes and other writings in [Banks'] possession, custody or control related directly or indirectly to any of the debtors captioned above ...," including "[t]he entire credit file relating to the above-captioned debtors" (Banks Mem. 7–8). Because it was obviously impossible to satisfy what amounted to a massive request (largely irrelevant to the lien perfection issue) in less than a week, Banks generously went to the trouble of culling documents relating to the perfection issue (Feb. 24 Tr. 51–52; Banks Mem. 8) and opening FNB's credit file for inspection. In spite of Banks' cooperation, however, Levit & Mason still apparently failed to prepare for the lien perfection issue known to be the sole focus of the evidentiary Hearing—and they surely did not ask for Ronco's sale-of-merchandise contracts they now complain of not having received.

**5.** C. Dickens, Bleak House 2 (Titan ed. [Dodd, Mead & Co.] 1951).

**6.** This refers to the briefing on the merits alone. As this opinion later reflects, the total briefing on all issues was well in excess of 100 pages.

tee's challenges, which may be summarized thus:

    1. Judge Merrick should have continued the Hearing because Committee's counsel had no adequate opportunity to prepare.

    2. Statute of frauds principles vitiate the testimonial evidence on which Judge Merrick based his crucial finding Ronco's sales to its customers (the "Contracts") were "sale or return" agreements.

    3. New evidence has surfaced since the Hearing, showing the Contracts were not "sale or return" contracts.

### 1. *Committee's Request for Continuance*

Committee first argues the Hearing was not fair because Committee was not given an adequate opportunity to prepare. Its memorandum can most charitably be characterized as disingenuous, because Committee inexcusably makes no mention of Levit & Mason's significant involvement in the case *before* the Hearing. Comm.Mem. 3 and 5 merely state Levit & Mason presented an application at the Hearing to represent Committee and Judge Merrick held the Hearing the same day over Committee's objections.

    ■ That statement of "facts" and accompanying argument were unquestionably designed to convey the impression Committee's counsel were new to the case, caught off guard and forced into a shotgun hearing without an opportunity to prepare. In truth, as this opinion's factual recital (including n. 4) shows, Levit & Mason were deeply involved in the case from the beginning—they not only had 2½ weeks' notice of the Hearing (the same as every other party) but also actively participated in setting the Hearing date and defining the narrow scope of issues to be considered. Levit & Mason's failure to exercise their

full opportunity to prepare was scarcely grounds for a continuance.

Committee's reply memorandum is even more disturbing. Rather than owning up to the inaccurate portrayal in the original memorandum, Comm.R.Mem. 7–8 contends Levit & Mason's prior participation in the proceedings was "not very relevant" (!) because until February 24 Levit & Mason had represented a single unsecured creditor (SAFT), which did not have the same "stakes in the outcome of the Hearing" as Committee and had not devoted significant resources to the case. In fact Levit & Mason's appointment as counsel for Committee represents a substantial continuity of their involvement in the case. As n. 3 reflects, SAFT's representative Glen Rank is Chairman of Committee (in the real world of bankruptcy practice, that is hardly unrelated to retention of Levit & Mason as Committee counsel). Even before Levit & Mason were appointed Committee counsel, they took the laboring oar by launching the major document request.[7] Finally, Levit & Mason cannot credibly argue, in light of their repeated and vigorous appearances and their major document request on SAFT's behalf, that their authorized activity did not embrace a few hours of factual or legal research on the narrow issue of perfection. In fact, even that characterization gives the Committee position too much credit, for what Levit & Mason actually did was to spend their time focusing inquiry on a much wider range of papers than the limited scope of the Hearing required—a misallocation rather than an inadequacy of resources.

It may be further indicative of the poverty of Committee's position that during the 7½ months since the Hearing, Committee has suggested no shred of relevant evidence or a single argument that was not presented on its behalf at the original Hearing.[8] Taken all in all, Committee has

---

**7.** In the February 17 letter transmitting documents to Mason in response to the February 15 document request (Banks Mem.App. B), Banks' counsel reflected the understanding with Mason's associate that Levit & Mason "will immediately make them available to any creditor of

Ronco, Inc. or its affiliates who may request access to the documents."

**8.** Committee argues one piece of new evidence has turned up, but in fact the parties and Judge Merrick were fully aware of it at the Hearing.

failed to show the slightest harm from the denial of a continuance, and has unwittingly demonstrated the wisdom of that denial.[9]

## 2. *Ronco's Agreements with Retailers: Statute of Frauds?*

Committee does not quarrel with Banks' perfected liens in Ronco's accounts receivable and inventory located in Illinois. On the obverse side of the coin, Banks acknowledge that if Ronco had inventory outside of Illinois, Banks would not have perfected liens in those goods because they never filed financing statements in other states as required by UCC § 9–103(d) (Illinois' version of the UCC, found in Ill.Rev. Stat. ch. 26, follows the same numbering as the Uniform Code). Consequently the issue before the Bankruptcy Court was whether goods shipped to out-of-state retailers (but not yet sold by them) represented *sales* by Ronco (thus creating accounts receivable with perfected liens) or merely out-of-state Ronco *inventory* on consignment[10] (and hence property subject only to unperfected liens, which in the present context means no liens at all).[11]

Banks' evidence that the Contracts involved sales rather than consignments consisted entirely of the testimony of Hofman, Ronco's vice-president of administration and previously (1967–79) its secretary-treasurer and chief financial officer. According to that uncontroverted testimony,

Ronco engaged in "straight sales" with some retailers and "guaranteed sales" with others. "Guaranteed sales" were made on a "sale or return" basis, under which the retailer could return unsold goods to Ronco. In support of Ronco's contention that the "guaranteed sales" were actually sales rather than consignments and that title passed to the retailer upon shipment, Hofman testified (Feb. 24 Tr. 92–103, 184–85):

1. Immediately upon shipment (which followed receipt of the retailer's purchase order) the retailer was billed for the full price of all shipped goods, though typically half the payment was deferred until after the Christmas season by agreement with the retailers.

2. Ronco's accounting system immediately booked the transactions as giving rise to accounts receivable, rather than having the shipped goods in Ronco's inventory account.

3. While the goods were in the retailer's hands, Ronco:

(a) did not insure them,

(b) could not control the resale price or other terms of resale,

(c) had no contact with resale customers and

(d) extended no credit to resale customers.

4. Each retailer, not Ronco, received the full sale price from, and issued a receipt to, its resale customers.

---

See the section of this opinion headed *New Evidence.*

**9.** Committee argues the denial of a continuance was improperly motivated by Judge Merrick's fear of a lapse of his jurisdiction upon expiration of this District Court's Emergency Rule under which the Bankruptcy Court was then operating (Feb. 7 Tr. 16). Although the record does reflect some concern on his part over that expiration, the obvious and real reason for expedited hearing and decision was discussed at great length: the issue of the Banks' lien perfection was the single most important element in determining the Debtors' continuing viability (for it would establish the presence or absence of free funds in Ronco's hands, as well as governing Banks' willingness to put up fresh money). In fact Comm.Mem. 18 makes the misleading argument Judge Merrick was pressured to make a quick determination that Banks' liens were valid, to preserve Debtors' ability to con-

tinue operating. Quite the contrary is true, for a determination that Banks' liens were *invalid* would have given Debtors the right to use proceeds of receivables and inventory *without* Banks' consent (Banks Mem. 14–15). In any event the reason for denial of a continuance is rendered irrelevant by the fact that no harm resulted from that denial.

**10.** "Consignment" (though the term is not one of fixed meaning) is employed here in the same sense as in Banks Mem. 21 n. 6: an arrangement by which Ronco would retain title to goods even after they were shipped to retailers.

**11.** Comm.Mem. 15–16 offers a tortured argument that Banks could not have perfected liens in goods manufactured out of state without making so-called UCC filings in those states. Neither logic nor the cited UCC provisions lend any legitimacy to that argument.

5. Retailers received no fee or commission from Ronco. Instead they looked to the profit derived from the full resale price they charged their customers.

On that basis Judge Merrick reached the only rational conclusion: Those Ronco-to-retailer transactions were indeed sales, giving rise to accounts receivable in which Banks had perfected liens.

Committee's first attack on that conclusion is that the use of Hofman's testimony to establish the terms of the Contracts violates the statute of frauds, UCC § 2–201. To that end Committee invokes UCC § 2–326(4), which (true enough) does refer to sale or return transactions and to the statute of frauds section of UCC.

But Committee totally misstates (or misapprehends) the significance and effect of UCC § 2–326(4). That provision explicitly divides sale-or-return arrangements into two separate contracts for UCC purposes:

1. sales to retailers and

2. returns by the retailers, treated as the equivalent of resales to the original seller for statute of frauds (and parol evidence) purposes.

If the "or return" portion of the transaction could not be proved without violating the statute of frauds (UCC § 2–201), that would not impact on the original sale to the retailer (the one at issue here) at all. Indeed UCC § 2–326(4) itself makes it plain parol evidence considerations would limit any *contradiction* of the "sale aspect of the contract" (the original sale), rather than vitiating or impairing the original sale.

Of course the *original* sale of goods is itself subject to the statute of frauds requirement of a writing embodied in UCC § 2–201. But counsel for Committee have offered nothing to suggest the original sales pose any problem in that respect. Hofman's testimony (Feb. 24 Tr. 92) that Ronco's sales were based on the receipt of retailers' purchase orders specifically confirms the existence of the required writing "by the party [the buyer] against whom enforcement is sought...." In response

to those purchase orders, Ronco performed its obligations by shipping the goods.

Nothing in Hofman's oral testimony about subsequent return rights by the customers can undercut the initial sale. If that oral testimony is admissible, it confirms Judge Merrick's sale-or-return conclusion. If not, the *original* sale portion of the transaction still stands. In either event what Ronco had immediately upon shipment were accounts receivable (*not* its own goods in someone else's hands), and Banks had a perfected lien on such receivables.

■ Viewed from that perspective, the problem is not one of the statute of frauds at all. It might at worst present a "best evidence" question as to the propriety of oral proof of the terms of *written* contracts (the retailers' purchase orders and Ronco's invoices). *Vigano v. Wylain, Inc.*, 633 F.2d 522, 527 (8th Cir.1980). But that kind of objection is properly deemed waived unless raised in the court of first resort (Fed.R.Evid. 103(a)(1)). And that is so because, as this case illustrates, doing so would have enabled Banks to cure any alleged flaw by producing the written Contracts (Fed.R.Evid. 103(a), Advisory Committee Note).

Committee raised no objection of that nature below. Its counsel, though fully aware lien perfection was *the* subject of the Hearing, made no effort to include the Contracts—the critical written documents—in their extensive documentary discovery request. And there is no hint the written Contracts would contradict or vary from Hofman's testimony in any respect that would transform Ronco's sales into non-sales.

■ In short the first of Ronco's contentions—that based on the statute of frauds—has proved empty. This opinion turns then to Ronco's second contention.

### 3. *New Evidence*

Committee's assertion of "new evidence" is as disinguous as its arguments for a continuance. It says Ronco has incurred expenses for shipping returned goods to

Illinois, supposedly implying those goods were initially delivered on consignment. But characterizing that information as "new evidence" is a total distortion, for the fact Ronco regularly paid such return expenses was specifically discussed at the February 3 hearing (Feb. 3 [4 p.m.] Tr. 57, 61), even by Levit himself (*id.* at 63). Levit & Mason were not only aware of that practice, they cross-examined Hofman on that very point at the Hearing (Feb. 24 Tr. 191–92).

■ Moreover, Committee's non-new "new evidence" would not alter the result in any event. Committee cites only UCC § 2–327(2)(b) for the proposition that the seller's payment of return freight negates the existence of a sale-or-return contract. As with the other phases of Committee's case, the cited provision does not stand for that principle at all. UCC § 2–327(2)(b) is only a gap-filler, for it states "unless otherwise agreed" the buyer bears the risk and expense of return. And the whole point of the evidence recited earlier in this opinion is that Ronco and its customers *had* "otherwise agreed." Indeed, even were Ronco's payment of freight viewed as a substantive factor in the equation—a factor suggestive of delivery on consignment—it would be overwhelmed by the factors itemized by Hofman, which show beyond any doubt the transactions were sales.

### 4. *Sale or Return: Relevant Authority*

All this has gone to show the poverty of Committee's arguments attacking the Hearing in procedural terms. On the substantive side of the matter, only a brief review of the law is required to demonstrate an equal (or greater) lack of merit in the argument the Contracts were not sales giving rise to accounts receivables (and therefore subject to Banks' lien).

As in initial matter, Committee cites not a single case in support of the position that the Contracts might be held consignment arrangements, and (as already discussed) its single statutory cite is inapposite. Similarly, this Court's independent research has revealed not a single authority in support of Committee's position.

There is strong authority, on the other hand, in support of Banks' position that the Contracts were "sale or return" contracts. First, UCC § 2–326(1) provides:

Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(a) a "sale on approval" if the goods are delivered primarily for use, and

(b) a "sale or return" if the goods are delivered primarily for resale.

Because there is no evidence of a contrary agreement, Ronco's Contracts are clearly "sale or return" agreements. Official Comment 1 to Section 2–326(1) confirms that a "sale or return" contract involves an initial sale rather than a consignment (emphasis supplied):

The type of "sale or return" involved herein is a *sale* to a merchant whose unwillingness to buy is overcome only by the seller's engagement to take back the goods (or any commercial unit of goods) in lieu of payment if they fail to be resold.

Moreover, though not directly in point (for they speak to the rights of the buyer's creditors, not the seller's), UCC §§ 2–326(2) and (3) point to the same result. Section 2–326(2) makes goods held on sale or return subject to the claims of the buyer's creditors while in the buyer's possession (wholly consistent with the concept the buyer has the right to the *goods*, while the seller's right is to *payment*). In like manner, Section 2–326(3) creates a strong presumption against consignment arrangements in the kind of dealing engaged in by Ronco with its customers:

Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this

subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale uses such words as "on consignment" or "on memorandum."

That strong preference for sale-or-return rather than consignment treatment is mirrored in the case law. See, e.g., *Nassar v. Smith*, 21 Ill.App.3d 462, 464–66, 315 N.E.2d 692, 694–95 (4th Dist.1974), finding a sale-or-return transaction under Section 2–326 in a much less compelling case than the present one.

Again, though, what must control here is the parties' course of dealing—how they conducted themselves commercially. And on that score every component of the transactions points unequivocally to Ronco as a *seller*, owed money (not goods) by its purchasers. Banks' perfected security interest in Ronco's accounts receivable therefore covered that indebtedness from the customers.

### Rule 11 Considerations

This appeal is the sort of case that makes laymen question the law, lawyers and courts. It has dragged on for nearly eight months, generated well over 100 pages of briefs, consumed hours of this Court's time, and undoubtedly cost the parties thousands of dollars in attorney's fees and other expenses. All that expenditure of time and money has occurred despite the ultimate conclusion the appeal is as groundless as one could imagine. Because of foot-dragging by Committee (resulting at one point in a dismissal for want of prosecution) and the accumulation of a good deal of procedural underbrush,[12] this Court has only on the latest round of briefing been able to examine the merits and to determine there are none.

All this makes worth considering the possible applicability of the recent amendments to Fed.R.Civ.P. ("Rule") 11, which now provides a more effective vehicle for redressing at least the direct financial harm to litigants subjected to groundless litigation. Rule 11 provides an attorney's signature on court-filed documents constitutes:

> his certificate that to the best of his knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Rule 11 goes on to say violations "shall" result in appropriate sanctions against either the party or the lawyer or both. Those sanctions may include the taxing of the "reasonable expenses incurred because of the filing ..., including reasonable attorneys' fees."

While originally Rule 11 required the subjective showing of a bad faith violation, the new language and Advisory Committee Notes[13] make clear the current version embodies a more objective test that mandates sanctions on a materially lesser showing. Because Committee's procedural and evi-

---

**12.** This Court must accept some responsibility in that respect, having directed the parties to address the question of Committee's standing. But that too was triggered by the nature of Committee's conduct. It launched the appeal acknowledging it spoke not for Ronco's creditors but for the creditors of Ronco's parent company. It sought to put the appeal into deepfreeze, anticipating Ronco's Chapter 11 proceedings might be reconverted to Chapter 7 bankruptcy and the trustee *then* acting for Ronco *might* elect to pursue the appeal. After substantial time had elapsed with no activity, unfairly leaving Banks' rights in a state of suspended animation, this Court dismissed the appeal for want of prosecution. That in turn led to a motion for reinstatement (granted by this Court), arguments over Committee's standing, further requests for extensions of time, and on and on.

**13.** Among other things the Advisory Committee characterizes the "affirmative duty imposed by the rule" as establishing a "standard ... of reasonableness under the circumstances." That standard is specifically described as "more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation."

dentiary arguments are so groundless, because on the uncontroverted evidence the Contracts are so unquestionably for sale or return, and because the entire conduct of the appeal (including the matters identified in n. 12) carries the implication of delaying tactics or other impermissible purpose, a substantial inference of improper purpose is warranted.

Accordingly Levit & Mason are directed to address the question of their satisfaction of Rule 11's new standard. To that end the order issuing on the present motion includes the following:

    1. On or before December 28, 1984 (a) Levit & Mason shall file a memorandum detailing the basis on which they claim they did not violate Rule 11 and (b) Banks' counsel shall file a memorandum stating the hourly rates of the lawyers involved in this appeal, at least the approximate hours spent by each and the approximate total time charges, and any other damages inflicted by this appeal.[14]

    2. On or before January 11, 1985 Levit & Mason shall state whether an evidentiary hearing is required on the damages question if Rule 11 is found applicable.[15]

This Court will then advise the parties of its ruling or the need for further proceedings.

### Conclusion

Judge Hertz's order, embodying Judge Merrick's decision sustaining Banks' lien rights, is affirmed. In addition, counsel are ordered to address the Rule 11 question in the manner just outlined. That collateral question is not however intended to affect the finality of the present affirmance of the Bankruptcy Court—a final judgment in all respects.

**14.** This less-than-precise showing by Banks is requested because this Court is reluctant to compound the problem by forcing added expenditure of time and money unless it finds Rule 11 in fact applies.

**15.** Both sides' counsel should be mindful of the possibility that any proliferation of time caused by truly unnecessary evidentiary presentations (as contrasted with paper submissions and the elimination by agreement of really non-controverted issues) might itself call Rule 11 into con-

### ON MOTION TO ALTER OR AMEND

On December 11, 1984 this Court issued its memorandum opinion and order (the "Opinion") affirming the ruling (the "Decision") by then Bankruptcy Judge Richard Merrick establishing the validity, priority and amount of liens held by First National Bank of Chicago and Wells Fargo Bank, N.A. (collectively "Banks") in the accounts receivable and inventory of Ronco, Inc. ("Ronco") and certain other affiliated corporations. In the course of the Opinion this Court directed Levit & Mason, attorneys for the appellant Creditors' Committee ("Committee") of Ronco Teleproducts, Inc. (not of Ronco itself), to address the potential applicability of Fed.R.Civ.P. ("Rule") 11 to their handling of the appeal.

In response Levit & Mason have not addressed the Opinion's disposition of the substantive merits, a disposition that has now become final. They have filed a timely motion (see Rule 59(e)) that the Opinion be altered or amended "by deleting or modifying the adverse comments contained therein" as to their professional conduct. For the reasons stated in this memorandum opinion and order, Levit & Mason's motion is denied.

### Rule 11's Standards

Levit & Mason essentially assert the important 1983 change in Rule 11's language was not intended to work any change in the Rule's standards. Their Mem. 1 quotes the Advisory Committee's reference to the *former* version of the rule that had been construed to require bad faith (emphasis added):

sideration. Even without that possibility, time spent in ascertaining damage sustained from a Rule 11 violation should also be recoverable on a "but for" principle (this has been the rule in determining chargeable attorneys' fees under Rule 37(a)(4)). For those reasons and because of the non-detailed nature of the original submission required from Banks, counsel are urged to confer informally to assist Levit & Mason in deciding on their second-stage submission.

The amended rule attempts to deal with the problem [of abuses in the signing of pleading and motions, and the reluctance of courts to impose sanctions] by *building upon and expanding* the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation.

Yet they appear unconscious of the fact the Advisory Committee used the terms "building upon" and "expanding"—a clear hallmark (amplified in the rest of the Advisory Committee's comments) the old regime had to be changed. Levit & Mason then indulge a non sequitur (Mem. 2):

> Although the intent of the 1983 Amendments is clearly to establish a "more stringent" standard, a finding of subjective bad faith, or at the very least of gross negligence, is still essential before sanctions may be imposed.

But as the following discussion reflects, it is exceedingly plain a new *objective* test of reasonableness has taken the place of Rule 11's former *subjective* test of good faith.

■ As with all questions of statutory (in this case, Rule) construction, the proper place of beginning is the statute (here the Rule) itself (emphasis added):

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; *that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the* *extension, modification, or reversal of existing law,* and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

It is critical to an understanding of Rule 11 to observe that the emphasized provision has been placed in the *conjunctive* with the "improper purpose" doctrine. What an attorney is deemed to certify is *both* (1) his or her "knowledge, information, and belief formed after reasonable inquiry"—an objective test—and (2) the absence of "any improper purpose"—a subjective test that supported the old "bad faith" requirement.[1] And that natural reading of the revised Rule is reconfirmed by its deliberate deletion of the provision that courts (e.g., *Badillo v. Central Steel and Wire Co.,* 717 F.2d 1160, 1166 (7th Cir.1983)[2]) had relied on as establishing the "subjective bad faith" standard—the requirement of wilfulness in the old Rule:

> For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action.

Levit & Mason would essentially have it the extensive and sometimes tortuous procedure of amending the Rules was gone through to create no real substantive change in Rule 11. But the 1983 Advisory Committee Notes, which it is profitable to quote extensively, teach exactly the opposite (citations omitted):[3]

> Since its original promulgation, Rule 11 has provided for the striking of pleadings and the imposition of disciplinary sanc-

---

**1.** Before the 1983 amendment Rule 11 defined the attorney's filing of a document as a representation:

> that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay.

Comparison of the Rule's old language with the amendment not only reflects the insertion into the Rule of the "formed after reasonable inquiry" language, creating a previously unprescribed duty, but also shows the deletion of a sentence later in the Rule that had limited disciplinary action to "a wilful violation of this rule." Later discussion in the text of this opinion provides further particulars.

**2.** *Badillo* was an affirmance of this Court's refusal to tax the losing plaintiff's lawyer with the defendant's attorneys' fees, No. 79 C 2122, slip op. (N.D.Ill. July 21, 1982).

**3.** Harvard Law School Professor Arthur Miller, one of the principal architects of the 1983 amendments to the Rules, has lectured to a substantial number of judicial conferences and other audiences on the intended effect of the Rule 11 amendment, delivering the same message as conveyed by this opinion. To this Court's knowledge, the peripatetic Professor Miller has not reduced those lectures to published law review form.

tions to check abuses in the signing of pleadings. Its provisions have always applied to motions and other papers.... Experience shows that in practice Rule 11 has not been effective in deterring abuses.... There has been considerable confusion as to (1) the circumstances that should trigger striking a pleading or motion or taking disciplinary action, (2) the standard of conduct expected of attorneys who sign pleadings and motions, and (3) the range of available and appropriate sanctions.... The new language is intended to reduce the reluctance of courts to impose sanctions ... by emphasizing the responsibilities of the attorney and reenforcing those obligations by the imposition of sanctions.

The amended rule attempts to deal with the problem by building upon and expanding the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation.... Greater attention by the district courts to pleading and motion abuses and the imposition of sanctions when appropriate, should discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses....

\*　　\*　　\*　　\*　　\*　　\*

The words "good ground to support" the pleading in the original rule were interpreted to have both factual and legal elements.... They have been replaced by a standard of conduct that is more focused.

The new language stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule. The standard is one of reasonableness under the circumstances.... This standard is more stringent than the original good-faith formula and thus it is expected that a great-

er range of circumstances will trigger its violation....

\*　　\*　　\*　　\*　　\*　　\*

The text of the amended rule seeks to dispel apprehensions that efforts to obtain enforcement will be fruitless by insuring that the rule will be applied when properly invoked. The word "sanctions" in the caption, for example, stresses a deterrent orientation in dealing with improper pleadings, motions or other papers. This corresponds to the approach in imposing sanctions for discovery abuses.... And the words "shall impose" in the last sentence focus the court's attention on the need to impose sanctions for pleading and motion abuses. The court, however, retains the necessary flexibility to deal appropriately with violations of the rule. It has discretion to tailor sanctions to the particular facts of the case, with which it should be well acquainted.

The reference in the former text to wilfulness as a prerequisite to disciplinary action has been deleted. However, in considering the nature and severity of the sanctions to be imposed, the court should take account of the state of the attorney's or party's actual or presumed knowledge when the pleading or other paper was signed....

Rule 11's changed meaning of course deprives pre-amendment cases such as *Badillo*, and the stringent standard established in those cases, of precedential force. Indeed the thrust of those pre-amendment cases is now exactly the opposite of what Levit & Mason contend, for they are illustrative of what motivated the Rule 11 amendment: what the Advisory Committee called the "reluctance of courts" to impose sanctions against the "empty head, pure heart" lawyer.[4] What those earlier cases should thus dictate is a corroboration of the

---

**4.** This catchphrase is of course an oversimplified description of the potentially assessable lawyer. It has however been used to describe the lawyer whose subjective good faith has, under the old version of Rule 11, insulated him or her from sanctions despite the advancement of clearly groundless claims or arguments.

*change* in standards that underpins this Court's original Opinion.[5]

No post-amendment Court of Appeals cases dealing with lawyers' post-amendment conduct appear to have been reported anywhere as yet. Unfortunately the waters have been muddied somewhat in our own Circuit by a case dealing with *pre*-amendment conduct (to which of course the old standard must apply as a matter of fundamental fairness—of due process, if you will). In *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1007 (7th Cir. 1984) our Court of Appeals was called upon to consider less-than-bad-faith 1982 conduct by a lawyer. Of course the Court followed its own *Badillo* precedent, and *Badillo*'s reading of Rule 11, thus rejecting fee-shifting under those circumstances.[6] But *Suslick* created a potential for confusion by the fact that, when Rule 11 was first referred to several pages earlier in that opinion, the opinion quoted the 1983 revised version (rather than the proper earlier version) in a footnote, 741 F.2d at 1003 n. 3.

That error however should not be permitted to obscure the issue. *Suslick* had no occasion to focus on the new language or on the reason for the substantial change in the Rule (and of course the litigants had no occasion to argue the matter, for it was not and could not be in issue there).

■ This Court does not view itself as bound by the *Suslick* mistaken footnote citation. It was not an expression of opinion (let alone a holding) at all, and even if it had been it would have been not only the archetype of pure dictum but (unintentionally of course) misguided dictum as well. Instead this Court adheres to its own decisions[7] and to those of the other District Courts that have also looked at the revised Rule (and its background) and have found it dictates an objective test, rather than the old subjective bad faith standard. See, e.g., *Rodgers v. Lincoln Towing Service, Inc.*, 596 F.Supp. 13, 22, 26–27 (N.D.Ill. 1984) (Judge Kocoras); *Zaldivar* (see n. 5); *Goldman v. Belden*, 580 F.Supp. 1373, 1381 (W.D.N.Y.1984); *Wells v. Oppenheimer & Co.*, 101 F.R.D. 358, 359 & n. 3 (S.D.N.Y.1984).

### *Levit & Mason's Conduct*

It remains then to measure what Levit & Mason have done against the objective yardstick created by Rule 11. Nothing in their current submission alters the Opinion's original sense of their having fallen far short of that standard.

■ First, Levit & Mason stress their fiduciary obligations to their clients, the Committee (Mem. 4 ff.). But it is not a coincidence that the newly-inserted language in Rule 11 (the part emphasized in this Opinion's quotation from the Rule) mirrors the standards in ABA Code of Professional Responsibility DR 7–102(A)(2) and in ABA Model Rule of Professional Conduct Rule 3.1 and its accompanying comment. All of them—Rule 11, the DR and the Model Rule—teach that a lawyer's duty to his or her client cannot be permitted to override his or her duty to the justice system, defined by all three of those rules.

As part of their argument, Levit & Mason contend they and Committee were not given the chance contemplated by the Bankruptcy Code to conduct appropriate examinations of "all matters which might be relevant to the issue of lien perfection." That is really nothing more than a rehash of the arguments rejected by the Opinion, and it is flatly wrong for the reasons articulated in the Opinion. Levit & Mason are effectively renewing the notion they were deprived of the opportunity to go fishing

---

5. Precisely that analysis of *Badillo* and its inapplicability to the new version of Rule 11 was made in *Zaldivar v. City of Los Angeles*, 590 F.Supp. 852, 856 (C.D.Cal.1984).

6. Earlier in 1984 the Court of Appeals had done exactly the same thing (except that it simply cited Rule 11 without quoting it) in *Gieringer v. Silverman*, 731 F.2d 1272, 1281 (7th Cir.1984).

7. See, e.g., *SFM Corp. v. Sundstrand Corp.*, 102 F.R.D. 555, 556–57 (N.D.Ill.1984) (imposing attorneys' fee sanctions) and *Pudlo v. Director of IRS*, 587 F.Supp. 1010, 1011 (N.D.Ill.1984) (denying such sanctions).

for an undefined catch, but again they give no explanation at all of their delay in propounding discovery *before* the Bankruptcy Court hearing whose scheduling Mason had concurred in, or of their failure to tailor their document request to the issues rather than launch a blunderbuss request, or of their general lack of preparation during the two and one-half weeks before the hearing. And once more they have not identified a single matter that would or might have been discovered had a continuance been granted.

Levit & Mason also assert they have a colorable argument that the transactions by the debtors (as sellers) ought to be treated—as to the sellers' creditors, not the buyers' creditors—as consignments rather than sale-or-return transactions. Two answers refute that bogus position. First, nothing in the UCC or the case law supports their position, and a review of Opinion 10–17 discloses *every* meaningful indicator points to sale-or-return. Second, the assertion they now advance was never even hinted at in their briefs before this Court (indeed, it was Opinion 16–17 rather than the parties' presentations that first commented UCC §§ 2–326(2) and (3) speak to the rights of the buyer's creditors, not the seller's). *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 103 F.R.D. 124, 127–28 (N.D.Cal.1984)[8] has properly pointed out that such post-hoc sleight of hand does not justify, for Rule 11 purposes, an empty or misleading presentation in the first instance.

■ Finally Levit & Mason urge they did not interpose the appeal for delay, nor did they deliberately mislead this Court. It is of course precisely the difficulty of divining someone's intentions that led to the change in Rule 11—as *Wells*, 101 F.R.D. at 359 put it:

> If subjective bad faith ... were the criteria [sic] the Rule might as well be repealed.[9]

That inquiry need not be made. Though it may be assumed Levit & Mason's motives may not have been evil (the absence of "subjective bad faith"), the *effects* of their conduct were as described in the Opinion. And the matter has come full circle to the meaning of Rule 11, for though "improper purpose" could well be an *aggravating* factor under the revised Rule, its absence does not *insulate* from sanctions the lawyer who fails the alternative objective standard.

In sum, Levit & Mason's position throughout their current submission is essentially that their fiduciary position (1) justified them in demanding the right to conduct a massive fishing expedition before the Bankruptcy Court engaged in any proceeding of substance and (2) required them to appeal an adverse lien decision because they believed the lien question to be a difficult one. They are wrong on both counts. Examination of the essential objective facts reflects that:

1. Levit & Mason have and had no tenable argument for their "consignment" position.

2. Whatever arguments they did raise in their memoranda were both groundless and misleading.

3. They never really attempted to comply with the lien hearing schedule, apparently preferring to assume they could ignore that process and then reopen the matter on appeal.

### Sanctions

It follows then that Levit & Mason have indeed violated Rule 11 and should be sub-

---

8. District Judge William Schwarzer, the author of *Golden Eagle,* has been (like Professor Miller) one of the most prolific commentators on the federal courts' awarding of attorneys' fees. He too reads revised Rule 11 in exactly the same way as does this opinion. Very shortly his article entitled *Sanctions Under the New Federal Rule 11—A Closer Look* will appear in a forthcoming issue of F.R.D.

9. *Wells* went on to observe (*id.* at 359 n. 3):
   Having been many years at the Bar before being on the Bench, we know from our own experience that there is no position—no matter how absurd—of which an advocate cannot convince himself.

jected to appropriate sanctions. As Opinion 18–20 suggested, reimbursement of Banks' attorneys' fees represents the most appropriate sanction under the circumstances. Levit & Mason's supplemental statement, filed January 10, has asked the opportunity to determine by negotiation with Banks' counsel the proper measure of the fees attributable to the issues decided by the Opinion. This Court will accordingly await a motion from either party on that score.

### Conclusion

 Levit & Mason have failed utterly to meet the requirement that their appeal on Committee's behalf was well grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law. Nor could they, in objective terms, have believed that after reasonable inquiry. Accordingly they have violated Rule 11 and are liable for Banks' attorneys' fees attributable to that violation. Their motion to alter or amend the Opinion is denied. This Court will await a motion from either party to enable this Court to establish the amount of the liability for fees.