In re MOLEN DRILLING CO., INC., Alleged Debtor.

Bankruptcy No. 86–40573.

United States Bankruptcy Court, D. Montana.

Jan. 9, 1987.

Sidney Thomas, Billings, Mont., for debtor.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

This case was commenced September 30, 1986, by the filing of an Involuntary Chapter 7 petition by Norwest Bank Billings, N.A. (hereinafter "Bank"), based on Section 303(b)(2) of the Bankruptcy Code, 11 U.S.C. 303(b)(2), which alleges Debtor Molen Drilling Co., Inc. (hereinafter "Molen") had less than 12 holders of claims, one or more in the aggregate of at least $5,000.00, and was not generally paying its debts as they became due. Subsequently, the Bank filed a Motion For Appointment of a Trustee and Molen on October 20, 1986, filed a Motion to Dismiss that motion. A show cause hearing was held October 29, 1986, and an Order was entered November 10, 1986, denying the Motion for Appointment of a Trustee; denying the Motion to Dismiss; and granting a preliminary injunction preventing Molen from transferring any property subject to the Bank's security interest. In answer to the involuntary petition, Molen resists the entry of an Order For Relief and plead affirmatively the filing of the petition under Section 303(b)(2) was improper as Molen has more than twelve creditors and thus invoking Section 303(b)(1) in the filing of the petition was bad faith. Molen requests dismissal of the action, costs, actual and punitive damages. Trial on the merits of the pleadings was held November 20, 1986. No post trial memorandums were requested although the parties took the liberty of apprising the Court as to their respective positions, which the Court has considered.

Two critical issues are raised in this proceeding. The first deals with whether sufficient petitioning creditors exist to satisfy the statutory requirement of 11 U.S.C. § 303(b)(1). The second issue is whether this case was commenced in good faith on the part of Norwest.

In Norwest's petition of September 30, 1986, at paragraph 8, Norwest alleges Molen has less than twelve creditors, thus invoking Section 303(b)(2), justifying Norwest's action of bringing this petition as a sole creditor. Norwest's basis for its belief as to the number of creditors is based on financial information furnished to Norwest by Molen in August, 1986, prior to the filing of the petition and a lien search of some creditors in Montana and surrounding states. Through this investigation, Norwest determined Molen had ten creditors, not including "insiders"—Barbara Molen, Don Molen and Brenda Molen. Molen's answer of October 29, 1986, denies the averments of Paragraph 8 of the petition, stating Molen has more than twelve creditors, thus challenging Norwest's basis for

bringing this proceeding under 303(b)(2). On November 20, 1986, the day of trial, Norwest filed joinders to its petition through claims of Carbon County, Montana; D & F Sanitation Service Inc., Billings, Montana; and Briarwood Subdivision Inc., Billings, Montana. The obvious effect of such action was to satisfy the requirement of 303(b)(1), where, when more than twelve creditors exist, three or more must join in the petition to trigger the implementation of an involuntary Chapter 7 proceeding under the Bankruptcy Code. In response, after the hearing, on November 23, 1986, Molen caused to be filed motions of D & F Sanitation and Briarwood Subdivision to withdraw their joinder petitions, along with supporting affidavits, on the grounds their joinder in this action was a result of misrepresentation on the part of Norwest, and that, had these creditors known the true reason for Norwest's solicitation, they would not have joined in the involuntary petition. Molen has incorporated the November 23 withdrawals into a December 2, 1986 Motion to Dismiss the petitions. Additionally, Molen requests dismissal of the Carbon County petition on the grounds it is the subject of a bona fide dispute.

Norwest asserts a claim of $3,184,044.40 principal with interest of $237,665.58 as of September 11, 1986. Norwest computes the daily accrual of interest at $720.65. The debt is evidenced by three separate notes, establishing a line of credit and a security interest in accounts receivable and five oil rigs which equipment Norwest appraises at between $495,000.00 and $995,-000.00. Thus Norwest appears undersecured by at least 2 million dollars. The remaining assets of Molen consisting of rolling stock (trucks and trailers), office equipment and parts for the drilling rigs were pledged in June, 1986, as security for the debt to Barbara Molen, an insider, and subsequently transferred to Molen Exploration, Inc., a new corporation formed in 1986. The Carbon County petition alleges a debt of $12,416.81 for personal property taxes through September, 1986. D & F Sanitation asserts a claim for $32.40 for services rendered through September 29, 1986, while Briarwood Subdivision's claim is in the amount of $45.40 for reasons unstated.

■ The record is now clear that the number of creditors of Molen as of the petition date, exceeded twelve, so the effect of withdrawal of the D & F and Briarwood petitions obviously would result in dismissal of the petition for lack of joinder of sufficient creditors. I note that the small amount of the two claims is not grounds for dismissal of the petition. *In re Okamoto*, 491 F.2d 496 (9th Cir.1974). The sole ground for request of dismissal is the allegation of misrepresentation on the part of Norwest's solicitation of the joinder petitions.

Molen cites the Court to authority allowing withdrawal of joinder. In *In re Coburn*, 126 F. 218, 220 (D.Mass.1903), the Court recognized "... (a) creditor misled may be permitted to withdraw". However, the better rule is that the Court may not permit a petitioning creditor to withdraw if to do so would defeat the petition. *Matter of Claxton*, 21 B.R. 905, 908 (Bankr.E.D. Va.1982); relying on *Reed v. Thornton*, 43 F.2d 813 (9th Cir.1930) and *Sheehan & Egan, Inc. v. North Eastern Shoe Co.*, 47 F.2d 487 (1st Cir.1931).

"Important policy considerations underlie this rule, which is aimed at avoiding collusion between petitioners and the debtor. An involuntary petition protects all creditors of the debtor not only those presently before the court. *In Re All Media Properties, Inc.*, 5 B.R. 126, at 144-145, (Bankr.S.D.Tex.1980), affirmed, 646 F.2d 193 (5th Cir.1981). If payment of the petitioners mandated dismissal, a debtor could induce a self-seeking petitioner to accept payment of his claim and withdraw from the petition. If this withdrawal defeated the petition, non-petitioning creditors would be denied the protection of the Act. *Sheehan & Egan v. Northeastern Shoe Co.*, supra. See also *In Re J.W. Ward Farming Co.*, 295 F. 60 (5th Cir.1923); *In Re All Media Properties Inc.*, supra, at 145 (decided under the Code); 3 *Collier on Bankruptcy*, 14th Ed. ¶ 59.35, p. 662-63."

In accord: *In re Ross*, 63 B.R. 951, 962 (Bankr.S.D.N.Y.1986). In *Claxton* the withdrawing petitioners claims had been partially or totally satisfied, while in the present case, the assertion of misrepresentation presents a different matter. However, the allowance of withdrawal would have the same effect, i.e., defeating the petition. Based on the above authorities, the petitions for withdrawal of D & F Sanitation and Briarwood Subdivisions must be denied and such petitioning creditors joining with Norwest satisfies Section 303(b)(1) of the Code. As a result, it becomes immaterial to pass judgment on whether Carbon County holds a bona fide claim.

 Molen further challenges the sufficiency of the joining petitioners due to their lack of verification. Rule 1008, Bankruptcy Rules, requires:

"All petitions, lists, schedules, ... shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."

A petition is defined at 11 U.S.C. § 101(34) as:

"... petition filed under Section 301, 302, 303, or 304 of this title, as the case may be, commencing a case under this title."

Where verification of the petition was not in the required form, it has been held to be insufficient. *In re Heltman-Thompson Co.*, 83 F.Supp. 156 (W.D.Mich.1949). The defect may be cured by amendment, but the right to amend lies within the sound discretion of the Court. *Heltman-Thompson* at 158. Molen theorizes, perhaps correctly, that amendment by the two small creditors cannot be achieved in this case, due to the subsequent petitioner withdrawals.

While the joinder petitions lack proper verification, Molen raises no objection to Norwest's verification, which in actuality, commenced this case. Additionally, the "withdrawing" petitioners have supported their withdrawals with affidavits, which adequately verify the averments of the joinder petitions. While there is a strict burden upon the petitioning creditors to prove a basis for involuntary relief on the merits, the procedural requirements for initiating the involuntary proceeding are not as strin-

gently enforced. See *In re Gill Enterprises, Inc.*, 15 B.R. 328, 331 (Bankr.D.N.J. 1981). The result of such a flexible approach is that, absent a clear abuse of process, the Court should address an involuntary petition on its merits. *In re Midwest Processing Co.*, 41 B.R. 90, 98 (Bankr. D:N.D.1984), rev'd on other grounds 47 B.R. 903 (1984), affirmed 769 F.2d 483 (1985). The petitions of D & F Sanitation and Briarwood Subdivision meet the requirements of Rule 1008.

 The second issue presented is whether the involuntary petition was commenced in good faith. Bad faith in an involuntary bankruptcy proceeding is a factual issue. *In re Advance Press & Litho, Inc.*, 46 B.R. 700, 704 (Bankr.D.Colo.1984). There exists a presumption of good faith in favor of the petitioning creditor, and thus the alleged Debtor has the burden of proving bad faith. *United States Fidelity & Guaranty Company v. DJF Realty & Supplies*, 58 B.R. 1008, 1011 (N.D.N.Y. 1986), citing *In re Crown Sportswear, Inc.*, 575 F.2d 991 (1st Cir.1978). The Ninth Circuit Bankruptcy Appellate Panel has determined that bad faith should be measured by an "objective test" that asks "what a reasonable person would have believed" as to the Debtor's financial status prior to filing the involuntary petition. *In re Wavelength, Inc.*, 61 B.R. 614, 620 (9th Cir.BAP 1986). *Wavelength* relied upon *In re Grecian Heights Owners Ass'n*, 27 B.R. 172, 173–74 (Bankr.Oreg.1982), which states:

"This court believes that bad faith should be measured by an objective test. The determination should be measured by what a reasonable person would have believed. The damage to a debtor from the filing of an unfounded involuntary petition is the same whether it is filed by a reasonable person acting in bad faith or by one who is so unreasonable that he proceeds in disregard of competent advice that his proposed course of action is without merit."

However, it is also the rule that a single petitioner has the duty to reasonably inves-

tigate or inquire about the Debtor's financial position with respect to the number of creditors of the Debtor.

" * * *

Courts have disagreed in their application of the good faith test to single creditor petitions. Some courts have applied a subjective standard, in which the creditor's motivations as well as its conduct should be considered, while others have applied an objective standard, and looked to whether a reasonable person in the position of the petitioning creditor would have initiated the involuntary case. In addition, some courts have likened an allegation of bad faith to a claim of fraud, and required proof by clear and convincing evidence. In this Court's view, the good faith test is analogous to the duty imposed by Rule 11, Fed.R. Civ.P., and Bankruptcy Rule 9011, of investigating the facts and the law prior to the signing and submission of any pleading or paper, and the same standards should apply. *See In Re Herriott*, 1 B.C.D. 793, 795 (Bankr.D.Mass.1975). Cf. *In Re Crown Sportswear, Inc.*, supra, 575 F.2d at 994.

Rule 11 of the Federal Rules of Civil Procedure was amended effective August 1, 1983, at the same time its nearly identical counterpart, Bankruptcy Rule 9011, also became effective. Under these rules, what an attorney is deemed to certify is *both* (1) his or her 'knowledge, information and belief *formed after reasonable inquiry'*—an objective test, and (2) the absence of 'any improper purpose'—a subjective test. *In Re Ronco, Inc.*, 46 B.R. 444, 454 (N.D.Ill.1985). *See generally, W. Schwarzer,* 'Sanctions Under the New Federal Rule 11—A Closer Look,' 104 F.R.D. 181, 186–93 (1985). According to the Advisory Committee Note, the new standard 'is one of reasonableness under the circumstances,' but 'stresses the need for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule.' Advisory Committee Note, Rule 11, Fed.R.Civ.P. The absence of such a prefiling inquiry will generally support a finding of bad faith in single

petitioning creditor cases." *In re Alta Title Co.*, 55 B.R. 133, 140–41 (Bankr.D. Utah 1985).

See also, *U.S. Fidelity & Guaranty Co. v. DJF Realty and Suppliers*, supra, at 1011, holding:

"An objective standard considers whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding. *In Re Grecian Heights Owners' Association*, 27 B.R. 172, 173 (Bankr.D.Oreg.1982). (The only reported court decision using solely the objective standard in determining bad faith). A subjective standard considers the petitioning creditor's motivation for filing the petition. *Basin Elec. Power Co-op v. Midwest Processing Co.*, 47 B.R. 903, 909 (D.N.D.1984), cert. denied, ─── U.S. ───, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986). In *Basin*, supra, the district court held that in deciding the issue of bad faith, the bankruptcy court should have considered petitioner's subjective motivations and its conduct. *Id.* The court reasoned:

Considering subjective motivations of petitioning creditors is analogous to considering possible ulterior motives of petitioning debtors in voluntary bankruptcy proceedings. It has long been recognized that using the Bankruptcy process to promote individual interests in a manner not consistent with the legislative purpose of the bankruptcy code is an abuse of jurisdiction of the bankruptcy courts. (citations omitted).

*Id.* This court agrees that the better practice is for bankruptcy courts to inquire into both the creditor's conduct, as well as into its motives for filing the petition. By so doing, bankruptcy courts will be able to insure that the legislative intent of the Code is carried out. Specifically, that petitioning creditors are not abusing the bankruptcy court's jurisdiction."

*USF & G v. DJF Realty* further holds that in considering petitioning creditors' motivation, the Courts have required nearly unconscionable behavior before finding bad

faith. Moreover, *In re Crown Sportswear*, 575 F.2d 991, 993, (1st Cir.1978), relied upon in *In re Alta Title Co.*, supra, holds that a cursory investigation by the petitioning creditor was sufficient to withstand a bad faith claim. In *Crown Sportswear*, the petitioning creditor's investigation as to the number of creditors consisted of discussions with an employee in their credit department who informed the creditor's attorney that she had no information as to the number of creditors, and by obtaining a copy of an assignment for the benefit of creditors, executed by the debtor, which also provided no information as to the number of creditors. The Circuit Court deemed the creditor's actions a cursory investigation into the creditor status of *Crown Sportswear*, reviewed the relevant case law, and found no authority to conclude that type of investigation undertaken by the creditor constituted bad faith. I therefore apply the above bad faith standard to the facts in this case.

The testimony of Linda Gerhardt, Assistant Vice President of the Loan Support Team of Norwest Bank and the officer who executed the petition on behalf of the Bank, stated that, at the time of the filing of the petition, her belief was that the Molens had less than twelve creditors. The basis for her conclusion was an accounts payable ledger supplied by Molen, dated August 15, 1986, listing Molen's creditors as six. This account payable ledger was a major source of Norwest's conclusion as to the number of creditors of Molen, although the creditors and amounts of obligation on the list changed monthly, of which Norwest was aware. Three of the parties on the August 15 list were contacted by Norwest employees (not including Gerhardt), who confirmed that their Molen obligation was satisfied. Norwest asserts the remaining three creditors could not be contacted or located. Norwest then ran a lien search on Molen and confirmed that just before the petition date Molen had ten creditors. Thus the August 15, 1986, list was clearly not accurate. Upon cross-examination, Gerhardt testified neither she nor any person for Norwest contacted Molen regarding an updated creditor list. Additionally,

the testimony revealed Norwest did not investigate as to Molen's status with the "traditional" creditors, i.e., the utilities supplying telephone and public services. As a result, not until after the filing of the petition does Norwest acknowledge the existence of more than twelve creditors. Gerhardt originally indicated her first knowledge of the existence of more than twelve creditors was upon the filing of Molen's answer on October 29, 1986, wherein 51 creditors were listed. Upon cross-examination Gerhardt changed her position as to knowledge of the existence of more than 12 creditors to receipt of a letter from Jerome Cate, attorney for Molen to Norwest's attorney, dated October 3, 1986, listing additional creditors not named in the petition of September 30, 1986.

It appears Norwest's inquiry into the number of creditors of Molen as of the date of the involuntary petition satisfies the standard of *Wavelength, Alta Title* and *Crown Sportswear*. Norwest's conclusion as to the number of creditors as ten was based upon information supplied by Molen and through Norwest's independent investigation. Although Norwest, as a result of their lien search, should have been aware that the creditor information supplied by Molen was inaccurate, the independent investigation by telephone calls and lien search clearly constitute more than the cursory investigation approved in *Crown Sportswear*. It is true that if Norwest had contacted Molen prior to the filing of the petition as to the current number of creditors, Norwest may have been apprised that the number exceeded twelve. And while contact with Molen may have been the prudent thing to do, the failure to contact Molen, when considered with the independent investigation, fails to constitute bad faith. The question then presented is why did Norwest file the involuntary petition and what benefit was sought by such course of action?

According to its testimony, Norwest basically had three options to pursue. One was to continue negotiations with Molen and hopefully arrive on an acceptable work out agreement. Negotiations had proceeded

for quite some time with little progress achieved. Under the proposed compromise, Molen would most likely retain its drilling equipment so as to secure future drilling contracts to provide revenue to pay down their obligations. However, to Norwest, negotiations became stalemated, and since Molen had not worked the rigs for a considerable period of time further progress along these lines did not appear viable.

The second option available was for Norwest to pursue their state law remedies, notably sue on the promissory notes and foreclose on their security. Such action would result in legal costs, some delay, and most likely antagonized feelings between the parties. Norwest concedes it would likely have succeeded in repossessing its security, but the effect would be to place Molen out of business, with no future ability to repay on its obligations. Ironically, the filing of the Chapter 7 involuntary petition accomplishes the same result.

The third option considered by Norwest was the commencement of an involuntary bankruptcy petition. Under Chapter 7, Molen's property would vest in the estate under the control of the Trustee for liquidation, but put Molen out of business, thus rendering it unable to pay on its debts from future contracts. Molen presented evidence through Mark Menke, Energy Banker for Norwest, of the advantages and disadvantages of the three options discussed. One advantage listed by Menke was that a Chapter 7 bankruptcy could put the burden of being the "bad guy" in shutting down Molen on the bankruptcy Trustee and Court, rather than the Bank. A second benefit was that the Trustee could investigate the transfer of assets to Barbara Molen and the newly formed Molen Company, therefore providing in Chapter 7 a vehicle to recover those assets for the benefit of all unsecured creditors. The shifting of the "bad guy" burden loses all appeal on the issue of bad faith when one considers the testimony of Douglas Kraft, head of the Energy Department of Norwest Bank, established that the decision to pursue the involuntary bankruptcy option was based on the large outstanding debt not being serviced, the break in negotiations, the

transfer of unencumbered assets to an insider, and the perception of no immediate relief on the horizon available to it. Accordingly, Norwest's motives for filing the Chapter 7 involuntary petition appear justified and consistent with the Bankruptcy Code's scheme to protect all creditors. When considering all the circumstances surrounding the filing of the petition, I cannot find bad faith on the part of Norwest sufficient to establish dismissal of the petition.

■ Having determined the petition contains the requisite number of creditors and was not filed in bad faith, the question now turns on whether Molen was generally not paying its debts as they become due. Those debts must not be subject to a bona fide dispute. 11 U.S.C. § 303(h)(1).

The "generally not paying" test is to be applied as of the date of filing of the involuntary petition and again the Court is to be guided by the totality of the circumstances existing when the petition is filed. *Matter of Bishop, Baldwin, Rewald, Dillingham & Wong,* 779 F.2d 471, 474–75 (9th Cir. 1985). The Court should properlyconsider both the number of creditors and amount due in determining whether the inability or failure to pay is in fact "general". *In re Reed,* 11 B.R. 755, 759 (Bankr.S.D.W.Va. 1981) cited in *Bishop,* supra, at 475.

The record indicates through the summer months preceding the filing Molen demonstrated an inability to pay their debts as they became due. In July, 1986, Molen paid 22 creditors out of 37 (59%) with total payments of $1,977.09 (1.2%). In August, 1986, creditors paid totaled 25 out of 34 (74%) with a total payment of $7,408.27 (0.2%) and in September, 1986, creditors paid were 31 out of 38 (82%) with payments of $3,649.84 (0.1%). Obviously, the large percentage of unpaid debt is a result of the $3 million obligation to Norwest, yet that undersecured debt is undisputed. When reviewed in its totality, the record shows Molen generally was not paying their debts as they become due from a lack of business and general diminution in the oil economy. Indeed, the rigs which are used to generate

the income had been "stacked", i.e., in non use, for several months.

■ Molen finally requests abstention by this Court pursuant to 11 U.S.C. § 305. Section 305 provides:

"305. Abstention

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension."

Molen asserts dismissal is in the best interests of all parties due to the joining petitioners' request to withdraw, the Debtor's reluctance and surprise in being forced into these proceedings, and the apparent indication that Norwest is the only party to benefit from these proceedings. While the Court has authority to dismiss the proceeding, *In re RAI Marketing Services Inc.,* 20 B.R. 943 (Bankr.D.Kans.1982), dismissal should be strictly construed, due to its extraordinary and non-appealable ramifications. Since Norwest had indeed satisfied the requirements of Section 303 of the Code, I find no extraordinary facts which justify dismissal. As a matter of fact, Molen presented no evidence at the November 20, 1986, hearing on its prospects to stay in business.

IT IS ORDERED that an Order For Relief under Chapter 7 of the Bankruptcy Code be entered.

The above constitutes Findings of Fact and Conclusions of Law, pursuant to Rule 7052, Rules of Bankruptcy Procedure.