BASIN ELECTRIC POWER COOPERA-TIVE, Dakota Fire and Safety Equipment Company, Inc., and Pump Systems, Inc., Petitioners and Appellees,

v.

MIDWEST PROCESSING COMPANY, Debtor and Appellant.

Civ. No. A4–84–148.

United States District Court, D. North Dakota, Northwestern Division.

Dec. 14, 1984.

Neal L. Wolf and Robert R. Steffek, Jr., Chicago, Ill., Timothy Q. Davies, Fargo, N.D., William P. Westphal, U.S. Trustee, Minneapolis, Minn., for debtor and appellant.

Bruce E. Bohlman, Grand Forks, N.D., for Basin Elec. Power Co-op.

Jack McDonald, Jr., Bismarck, N.D., for Dakota Fire & Safety Equipment Co.

Michael Maus, Dickinson, N.D., for Pump Systems, Inc.

1. R.A. refers to Record on Appeal.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This is an appeal from a May 24, 1984 order for relief entered by the United States Bankruptcy Court for the District of North Dakota. On March 29, 1984, Basin Electric Power Cooperative (Basin) filed an involuntary petition against Midwest Processing Company (Midwest) under Chapter 11 of the Bankruptcy Code. Midwest opposed that petition. The contested petition was tried to the Bankruptcy Court on May 4 and 5, 1984, and the order now on appeal was entered following that trial. On Midwest's motion, the Bankruptcy Court stayed its order for relief pending this appeal.

## FACTS

Midwest was formed in 1979 and has operated a sunflower processing plant near Velva, North Dakota since June of 1982. (R.A. 33 at 2).[1] Midwest's stock is currently owned by Pillsbury Company (46%), A.E. Staley Company (46%), and Neshem-Peterson & Associates (8%). (R.A. 51 at 231).

Basin is a non-profit supplier of wholesale electric power. One of Basin's generating plants, the William J. Neal Station (Neal Station), is located near Velva, North Dakota and is an integral part of Midwest's operation. The Neal Station is a lignite coal-fired base load generating station. (R.A. 51 at 204).

On December 12, 1980, Midwest and Basin executed agreements whereby Basin was to supply Midwest with processed steam and demineralized water and Basin in turn was to purchase sunflower seed hulls from Midwest. The sunflower seed hulls were to be burned through Basin's generating operations. To accomodate those agreements, it was necessary for Basin to undertake a construction project at the Neal Station to make steam and water related improvements and to construct hull handling facilities. Basin invested approximately $5.8 million in these improvements

(R.A. 51 at 100); that cost was to be recovered through charges to Midwest, including charges for depreciation and interest on Basin's investment cost, charges for steam and water used by Midwest (R.A. 51 at 258), and "capacity payments" to cover that portion of Basin's operating and maintenance costs attributable to Midwest's operation. (R.A. 51 at 211). The agreements provided that Basin would give a one year notice of termination. (R.A. 51 at 145).

To secure Basin's investment, Midwest maintained a $4 million deposit at First National Bank of Minneapolis from June, 1982 through August, 1982. (R.A. 51 at 131). Beginning in August, 1982, Basin's investment was secured through a $5 million letter of credit at Continental Illinois National Bank and Trust Company of Chicago (Continental Illinois). That letter of credit was renewed in April, 1983 and was to expire on March 31, 1984. (R.A. 51 at 132). In conjunction with the letter of credit, Basin and Midwest entered into an escrow agreement detailing the terms under which the parties could draw on the letter of credit. One of the conditions under which Basin could draw on the letter of credit was if a petition in bankruptcy was filed against Midwest and if that petition was not dismissed for a period of sixty days. (R.A. 51, Ex. 12).

Basin made a tax benefit transfer of the facilities constructed to accomodate Midwest's operation. That tax benefit transfer generated approximately $2.5 million in revenue to Basin. (R.A. 51 at 183).

Midwest has outstanding long-term debt in the amount of $45 million, 90% of which is guaranteed by the Farmers Home Administration (FmHA). (R.A. 51 at 142). The portion of the long-term debt which is not guaranteed is held by sixteen area financial institutions. Midwest is obligated to make semi-annual interest payments on its long-term debt of approximately $2.8 million and to begin repayment of principal in 1985. Midwest did not make the interest payment due on February 28, 1984. (R.A. 51 at 142). Prior to initiation of the bankruptcy proceedings, Midwest had been ne-gotiating a restructuring of its long-term debt. (R.A. 51 at 344).

Sometime in February, 1984, Midwest shut down its sunflower processing operation and laid off some of its employees. Because of Midwest's plant shut down, Basin was concerned for the security of its investment. (R.A. 51 at 134). For several months prior to this time, the parties had been discussing renewal of the Continental Illinois letter of credit. Basin argues that the agreements between it and Midwest require that Midwest maintain either a payment bond or a letter of credit in an amount and in a form reasonably acceptable to Basin as security for receipt of the payments Midwest is required to make under their agreements. Midwest did not provide Basin the assurances it desired that a letter of credit would be maintained. On February 28, 1984, Basin gave notice that it considered Midwest's failure to provide those assurances a default under the agreements. (R.A. 51, Ex. 15).

On March 20, 1984, Midwest's financial situation was discussed at a meeting between representatives of Midwest, Basin, Pillsbury Company, and A.E. Staley Company. Midwest outlined its efforts to restructure its long-term debt, Pillsbury Company's efforts to buy out the unguaranteed long-term note holders, and Pillsbury Company's efforts to sell its interest in Midwest to A.E. Staley Company. Midwest sought Basin's assurance that it would continue to provide services for a three-and-one-half year period as well as a reduction in Basin's steam and water charges. On March 23, 1984, Midwest informed Basin that Midwest did not intend to renew the letter of credit. By letter dated March 29, 1984, Basin gave notice of termination of the agreements based on Midwest's failure to cure the default asserted in Basin's February 28, 1984 letter. (R.A. 51 at 149). Basin demanded that Midwest pay the entire outstanding principal and interest due on the cost of the Neal Station improvements, an amount Basin calculated to be approximately $5.3 million. Midwest disputed its contract obligation to

maintain the letter of credit, and disputed Basin's assertion that the failure to provide such letter of credit gave rise to default under the parties' agreements. The effect of Basin's draw on the letter of credit was to make Continental Illinois a creditor of Midwest and so to reduce the funds available for payment of other creditors. (R.A. 51 at 158). After Basin's draw on the letter of credit, Midwest's only remaining debt to Basin is approximately $300,000, and that debt is in dispute.

The parties agree that Midwest made all payments required under their agreements except for the accelerated balance which is disputed. (R.A. 51 at 108). Midwest, however, vigorously disputes its obligation to pay the accelerated balance arising by virtue of Basin's declaration of default and termination of the agreements. (R.A. 51 at 103). That dispute is the subject of state court litigation. Midwest was current on payments to other creditors with the exception of the interest on its long-term debt. (R.A. 51 at 289–90).

The Neal Station is, at least at certain times, Basin's costliest generating facility. Midwest asserts that Basin has determined it would be in Basin's best interest if Midwest were to cease operation so that Basin would no longer have any contractual obligation to keep the Neal Station operational. (R.A. 51 at 215–26).

On March 29, 1984, the same day on which it declared Midwest to be in default, Basin filed the bankruptcy petition against Midwest. No other Midwest creditors joined in the petition. Midwest moved to dismiss the petition for lack of three creditors as required under 11 U.S.C. § 303(b)(1). The Bankruptcy Court denied that motion without prejudice and gave Basin an opportunity to solicit intervening creditors. The Bankruptcy Court directed that notice of the proceedings be given to other creditors. (R.A. 49 at 20).

On April 30, 1984, Dakota Fire and Safety Equipment Company, Inc. (Dakota) moved to intervene. Midwest had owed Dakota $206.69 on the date the petition was filed; that debt was paid on April 13, 1984.

Also on April 30, 1984, Apollo Piping Supply, Inc. and Minot Auto Supply moved to join in the petition; Apollo Piping Supply, Inc. and Minot Auto Supply both later withdrew their motions. On May 4, 1984, Pump Systems, Inc. (Pump Systems) moved to intervene. Midwest had owed Pump Systems $90.28 on the date the petition was filed; that amount was paid in full shortly thereafter. Both Dakota and Pump Systems entered into indemnity agreements with Basin which protected them from costs associated with the bankruptcy proceeding. (R.A. 51 at 71). Both Dakota and Pump Systems have joined in Basin's brief on appeal.

At trial, Midwest submitted affidavits of eleven of the sixteen financial institutions which hold Midwest's unguaranteed debt; each affidavit stated that the institution desired that the bankruptcy proceedings be dismissed. (R.A. 23). Midwest also submitted an affidavit of FmHA stating that it was involved in discussions regarding restructuring of Midwest's long-term debt and that it desired a resolution outside the bankruptcy proceedings. (Attachment to R.A. 21).

At the close of Basin's presentation at trial, Midwest moved to dismiss the petition on grounds that Basin had known of the existence of more than twelve Midwest creditors at the time it filed the involuntary petition but had failed to join two other creditors as required under 11 U.S.C. § 303(b)(1), that not all of the petitioning creditors alleged all elements of an involuntary proceeding, that the petition and motions to intervene were filed in bad faith, and that dismissal would be in the best interests of the debtor and its creditors. The Bankruptcy Court again denied Midwest's motion to dismiss.

## ISSUES

On appeal, Midwest alleges error in four rulings of the Bankruptcy Court: 1). failing to dismiss Basin's petition for failure to join two other creditors and permitting the intervention of other creditors, 2). failing to dismiss by reason of Basin's bad faith,

3). entering an order for relief when all three petitioning creditors did not allege all elements of an involuntary case, 4). finding that Midwest is generally not paying its debts as those debts become due.

## STANDARD OF REVIEW

■ This Court must first determine the standard under which the decision of the Bankruptcy Court is to be reviewed. Midwest argues that the applicable standard of review is that found in the temporary local rules adopted by this Court following the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).[2] Under that local rule, the findings of the bankruptcy court were accorded no deference when reviewed by the district court. The petitioning creditors argue that this Court must apply instead a clearly erroneous standard; they assert that standard applies because the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA) establishes a clearly erroneous standard for review of cases referred to the bankruptcy court by reason of a standing order of the district court.

This Court concludes, though for reasons other than those urged by the creditors, that the findings of the bankruptcy court must be reviewed under the clearly erroneous standard. Subsequent to adoption of the temporary local rule, the Supreme Court promulgated new bankruptcy rules.[3] Included in those rules is Rule 8013, which provides:

> On an appeal the district court ... may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

This Court has previously held that, given Rule 8013 and the Eighth Circuit's approval of the clearly erroneous standard, decisions of the bankruptcy court will be reviewed under the clearly erroneous standard. *In re Clothes, Inc.*, 40 B.R. 997 (D.N.D.1984). This Court will adhere to its earlier decision. *See also In re Morrissey*, 717 F.2d 100, 104 (3d Cir.1983); *Kressel v. Kotts*, 34 B.R. 388, 391 (D.Minn.1983). The order of the Bankruptcy Court will be reviewed under the clearly erroneous standard.

## THREE CREDITOR REQUIREMENT

■ The Bankruptcy Code defines the requirements for commencement of an involuntary case as follows:

> An involuntary case is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability ... if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders ... by one or more of such holders that hold in the aggregate at least $5,000 of such claims ....

11 U.S.C. § 303(b). Under this statute, a single creditor can commence an involuntary case only if the debtor against whom the proceeding is commenced has fewer than twelve creditors.

On March 29, 1984, when Basin filed the involuntary petition against Midwest, Midwest had over 100 creditors. Basin's petition made no allegation that Midwest had fewer than twelve creditors; nor did it allege that Midwest had twelve or more creditors. Basin simply ignored the three creditor requirement of § 303(b), even

---

**2.** *In the Matter of the Adoption of an Emergency Resolution Relating to Bankruptcy,* (D.N.D. Apr. 9, 1984).

**3.** Under 28 U.S.C. § 2075, bankruptcy rules prescribed by the Supreme Court took effect ninety days after they were reported to Congress.

though Basin knew that Midwest had twelve or more creditors. (R.A. 51 at 384).

■ The Bankruptcy Court subsequently allowed other creditors to join in the petition so as to meet the three creditor minimum. The Bankruptcy Code includes the following provision on joinder by other creditors:

> After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

11 U.S.C. § 303(c). Despite the liberal joinder envisioned under § 303(c), the three creditor requirement of § 303(b) would be rendered meaningless if subsequent joinder of additional parties were sufficient in all cases where fewer than three creditors originally commenced an involuntary case against a debtor who has twelve or more creditors. Section 303(c) may properly be invoked where a single petitioning creditor is unaware that a debtor has twelve or more creditors. But where, as in this case, a single creditor commences an involuntary case despite knowledge that the debtor has twelve or more creditors, the petition is deficient and should be dismissed absent special circumstances.

This ruling is in accord with prior case law and with the purposes behind the statutory scheme for filing involuntary petitions in bankruptcy. Other courts have recognized that a single creditor who has knowledge that a debtor has twelve or more creditors, but who nonetheless files an involuntary petition without the requisite three creditors acts in bad faith. *See In re Crofoot, Neilson & Co.*, 313 F.2d 170, 171 (7th Cir.1963); *Navison Shoe Co. v. Lane Shoe Co.*, 36 F.2d 454 (1st Cir.1929). When such a petition is filed in bad faith, later joinder of additional creditors has been denied. *In re Rite-Cap, Inc.*, 1 B.R. 740, 741 (Bankr.R.I.1979); *In re Crown Sportswear, Inc.*, 575 F.2d 991, 993 (1st Cir.1978).

*See also* Weintraub & Resnick, *Involuntary Petitions Under the New Bankruptcy Code*, 97 Banking L.J. 292, 304 (1980); 2 Collier on Bankruptcy ¶ 303.33 (15th ed. 1984). *But cf. Matter of Trans-High Corp.*, 3 B.R. 1 (Bankr.S.D.N.Y.1980).

■ The statutory three creditor requirement reflects the purpose of an involuntary bankruptcy proceeding as envisioned by Congress: to protect the interests and desires of the creditors as a whole. That reasoning has application to the facts of this case. Those creditors holding the largest claims against Midwest do not desire a bankruptcy proceeding, but were attempting instead to reach an out-of-court restructuring agreement before Basin filed the involuntary petition. Indeed, Basin's unsecured debt represents a small fraction of Midwest's total debt. Filing an involuntary petition may have been in the best interests of Basin, but was not seen by Midwest's other creditors as being in their best interests.

Basin's claim against Midwest is the subject of a significant dispute between the parties both as to liability and as to amount. Accordingly, the Bankruptcy Court did not consider Basin's claim in determining whether Midwest was generally not paying its debts as they became due. (R.A. 33 at 21). That Midwest's debt to Basin cannot be considered as evidence of nonpayment of debts is further reason for strict adherence to the three creditor requirement.

This Court concludes that the Bankruptcy Court erred in not dismissing Basin's petition against Midwest for failure to meet the three creditor requirement of § 303(b).

## ALLEGATIONS OF BAD FAITH

Midwest alleges that the Bankruptcy Court erred in failing to dismiss the petition by reason of Basin's bad faith in filing the involuntary petition. Midwest asserts that Basin's only purpose in filing the petition was to draw on the Continental Illinois letter of credit and that such a purpose is

not consistent with the objectives of the Bankruptcy Code. Midwest asserts that this is essentially a contract dispute between Basin and Midwest and should more properly be resolved in a contract action.

In evaluating Midwest's allegations of bad faith, the Bankruptcy Court refused to consider Basin's subjective motives in filing the involuntary petition. (R.A. 33 at 23). The Bankruptcy Court considered Basin's conduct against a standard of whether a reasonable person in the position of the petitioning creditor would have initiated the bankruptcy proceeding. (R.A. 33 at 26).

■ This Court is convinced that the Bankruptcy Court should have considered Basin's subjective motivations together with its conduct in reaching a determination on the question of bad faith. Though it is often difficult to ascertain a petitioning creditor's subjective motivations, other courts have considered those motivations when they could be ascertained. *See, e.g., In re Hunt*, 496 F.2d 882 (5th Cir.1974) (affirmed dismissal of involuntary petition where petitioning creditor had not acted in good faith during course of settlement negotiations); *Matter of Win-Sum Sports, Inc.*, 14 B.R. 389 (Bankr.D.Conn.1981) (involuntary petition dismissed where parties attempted to use bankruptcy court as alternative to state court procedures to resolve intra-company management and stockholder problems); *In Re G–2 Realty Trust*, 6 B.R. 549 (Bankr.D.Mass.1980) (dismissed involuntary petition where entity had changed from a nominee trust to a business trust solely to become eligible to qualify as debtor for Chapter 11 purposes).

■ Considering subjective motivations of petitioning creditors is analogous to considering possible ulterior motives of petitioning debtors in voluntary bankruptcy proceedings. It has long been recognized that using the bankruptcy process to promote individual interests in a manner not consistent with the legislative purposes of the Bankruptcy Code is an abuse of the jurisdiction of the bankruptcy courts. *See, e.g., In re Nancant, Inc.*, 8 B.R. 1005 (Bankr.D.Mass.1981) (dismissed voluntary petition where debtor's sole purpose in filing was to avail itself of the bankruptcy court's jurisdiction to hear and determine its real estate tax controversy); *In re Noonan*, 17 B.R. 793 (Bankr.S.D.N.Y.1982) (refused to confirm reorganization plan where sole purpose in filing voluntary petition had been to avoid contractual obligations). *See also* Ordin, *The Good Faith Principle in the Bankruptcy Code: A Case Study*, 38 Bus.Law. 1795 (1983).

Basin's motivation for filing the involuntary petition is easily ascertained. The manager of Basin's Department of Accounting and Finance testified at trial, and his testimony included the following:

Q. What did you tell him was the reason why the petition was filed with the Court?

A. That the letter of credit which was the only security that Basin Electric had under a contract with Midwest Processing, expired, and that we had no recourse but to draw down on the letter of credit which required the filing of the petition.

Q. Was that the sole reason you gave ... regarding the filing of the bankruptcy petition?

A. The reason for our action. That was the sole reason for our action in effect.

(R.A. 51 at 396). Minutes of a March 20, 1984 meeting of certain Basin personnel include the following statement:

[I]t was determined that Basin Electric should make the necessary preparations to draw on the letter of credit. It was explained that the only sure way to draw on the letter is to file an involuntary petition in bankruptcy against Midwest. To do that, Basin Electric would, at a minimum, need two and perhaps three other Midwest creditors.

(R.A. 51, Ex. 47).

■ Basin filed the involuntary petition to put itself in a more advantageous position with respect to the Continental Illinois letter of credit. In so doing, Basin attempted to invoke the jurisdiction of the Bankruptcy Court to affect a contract dispute. In light of Basin's motivations for

filing the involuntary petition, this Court concludes that the Bankruptcy Court erred in not dismissing the petition by reason of Basin's bad faith. *See In Re Rush*, 10 B.R. 526 (Bankr.N.D.Ala.1981) (if issue of bad faith is decided against original petitioners, petition should be dismissed regardless of later intervention by other creditors).

■ Midwest also alleges that Dakota and Pump Systems moved to intervene in bad faith and that because of their bad faith, their intervention should not have been allowed. Midwest asserts that both joined in the petition only out of concern for their business relations with Basin and only after Basin made broad indemnity agreements with them. Both Dakota and Pump Systems held unsecured and undisputed, though seemingly insignificant, claims against Midwest when the petition was filed. Though there is evidence suggesting Dakota and Pump Systems were actually motivated to file their motions because they wanted to protect their business relationships with Basin, this Court cannot conclude that the Bankruptcy Court committed clear error in finding that neither Dakota nor Pump Systems acted in bad faith.

### ALLEGING ALL ELEMENTS OF INVOLUNTARY CASE

■ Midwest alleges error in not dismissing the involuntary petition on grounds that each of the petitioning creditors did not allege each of the essential elements of an involuntary case. Section 303(h) provides:

> [T]he court shall order relief against the debtor in an involuntary case ... only if ... the debtor is generally not paying such debtor's debts as such debts become due ....

Midwest asserts that, because neither Dakota nor Pump Systems specifically alleged that Midwest was not generally paying its debts as those debts became due, neither Dakota nor Pump Systems effectively joined in the involuntary petition. Both motions to join the involuntary petition stated:

> [T]he undersigned hereby joins in the Petition for Involuntary Reorganization ... filed by Basin Electric Power Cooperative in the above-entitled matter ....

(R.A. 18, 22). Basin's petition specifically alleged that Midwest was generally not paying its debts as they became due. The statements of joinder in Basin's petition are sufficient allegation by both Dakota and Pump Systems of each of the essential elements of an involuntary case.

Midwest next argues that testimony of representatives of Dakota and Pump Systems constituted disclaimers of the allegations contained in the motions to join the petition. The testimony of Pump System's president included the following:

> Q. Do you sit here today under oath and allege that Midwest has not been paying its debts as they fall due?
>
> A. No.
>
> Q. You are not saying that Midwest has not been paying its debts as they fall due?
>
> A. No, I'm not.

(R.A. 51 at 34). The testimony of Dakota's president included the following:

> Q. ... Is it your contention that Midwest is not paying their creditors generally as their debts become due?
>
> A. They are paying my debts. As far as all the general creditors, I'm not aware.
>
> Q. You don't know one way or the other whether they're paying their creditors?
>
> A. The only thing I could go by there was the fact that they defaulted on a payment. And it was on radio and TV and then the newspaper.

(R.A. 51 at 60–61). However, neither Dakota nor Pump Systems withdrew its motion to intervene.

The testimony quoted above was part of the evidence available to the Bankruptcy Court when reaching its determination of whether Midwest was generally not paying its debts as debts became due. While the testimony might lead one to question the sincerity of Dakota and Pump Systems, the

testimony concerns the merits of the petition rather than the sufficiency of the motions. This Court finds no error in the Bankruptcy Court's denial of Midwest's motion to dismiss for failure of each of the petitioners to join in each essential element of an involuntary case.

## MERITS OF THE PETITION

Having concluded that the Bankruptcy Court erred in not dismissing the involuntary petition for failure to meet the three creditor requirement and by reason of Basin's bad faith in filing the petition, it is not necessary that this Court address the final issue raised by Midwest: that the Bankruptcy Court erred in its finding that Midwest is generally not paying its debts as such debts become due.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED:

1). That the May 24, 1984 order of the Bankruptcy Court is reversed.

2). That the involuntary petition is dismissed.

3). That judgment be entered accordingly.