In the Matter of CANAL PLACE LIMITED PARTNERSHIP, etc., Debtor.

CANAL PLACE LIMITED
PARTNERSHIP, etc.,
Appellant,

v.

AETNA LIFE INSURANCE CO., and
Travelers Insurance Co., Appellees.

No. 90–3620.

United States Court of Appeals,
Fifth Circuit.

Jan. 8, 1991.

---

Richard W. Ward, David F. Brown, Liddell, Sapp, Zivley, Hill & LaBoon, Dallas, Tex., for appellant, debtor.

Alan H. Goodman, Lemle & Kelleher, New Orleans, La., Hugh Ray, Houston, Tex., for appellee Aetna Life Ins. Co.

R. Patrick Vance, Elizabeth Futtrell, Peggy Brister, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for appellee Travelers Ins. Co.

Before WISDOM, KING and JOLLY, Circuit Judges.

PER CURIAM:

Canal Place Limited Partnership, Chapter 11 debtor and appellant herein, appeals the decision of the district court affirming the order of the bankruptcy court lifting the automatic stay afforded by 11 U.S.C. § 362 in order to permit Aetna Insurance Company and Travelers Insurance Company to foreclose on Phase I and Phase II, respectively, of the Canal Place project in New Orleans. In the Findings of Fact and Conclusions of Law accompanying its order, the bankruptcy court carefully considered the issues raised by the debtor, Aetna and Travelers in that court and by appellant in this appeal. In so doing, the bankruptcy court fully and effectively discharged its responsibility under this court's en banc opinion in *In the Matter of Timbers of Inwood Forest Assocs., Ltd.,* 808 F.2d 363, 370 (5th Cir.1987), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), to evaluate the reorganization profile of the debtor in order to determine whether there was a reasonable prospect for a successful reorganization within a reasonable time before allowing the stay to remain in effect. We cannot improve on the bankruptcy court's Findings of Fact and Conclusions of Law (a copy of which is attached hereto)

and affirm the district court's judgment on the basis of those findings and conclusions.

AFFIRMED.

United States Bankruptcy Court Eastern District of Louisiana

In the Matter of Canal Place Limited Partnership, d/b/a Canal Place 2000, Debtor.

Number 90–10563–K

Chapter 11 Reorganization

## FINDINGS OF FACT
## CONCLUSIONS OF LAW

On June 11, 1990, this matter came before the Court as a hearing, among others, on the motions of Aetna Insurance Company and Travelers Insurance Company for relief from the automatic stay. Desiring to enter written reasons for its decision, the Court took the matter under advisement and directed counsel to file proposed findings and conclusions. Having carefully considered the arguments of counsel, the testimony of witnesses, the evidence adduced, and the applicable law, the Court now enters its Findings of Fact and Conclusions of Law. For the reasons expressed herein, the Court will grant the motions of Aetna and Travelers and lift the automatic stay allowing Aetna and Travelers to foreclose on the property commonly known as Canal Place.

### Findings of Fact

1. On February 21, 1990, the Debtor, Canal Place Limited Partnership d/b/a Canal Place 2000, filed its voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code.

2. On June 8, 1990, just three days before the hearing on Aetna's and Travelers's motions to modify the stay, the Debtor filed its disclosure statement and plan of reorganization.

### The Structure and Management of the Debtor

3. The Debtor is a partnership in commendam, a limited partnership under Louisiana law; it was formed on April 5, 1985.

4. The Debtor has four general partners: Aminvest Canal, Inc.; Aminvest Mississippi, Inc.; Aminvest Vieux Carre, Inc. (collectively the "Aminvest Companies"); and Aminvest Partnership. The Aminvest Partnership has the three Aminvest Companies as general partners plus a fourth corporate general partner named Rima Enterprises. The Aminvest Companies only have corporate shareholders.

5. Mr. Michael B. Rohlfs is the president and one of the board of directors of the Aminvest Companies. His involvement with the Debtor began less than two years ago. Beginning approximately fourteen months ago, he began serving, and continues to serve, as the chief operating officer of the Debtor. Despite holding these positions, he receives no compensation from the Debtor, and he has no ownership interest in the Debtor, either directly or indirectly.

6. Mr. Rohlfs' sole compensation comes from his employer Dearborn Financial ("Dearborn"). Dearborn is a Chicago based investment adviser which specializes in representing foreign clients who have investments in the United States. Dearborn does not represent the Debtor or any of the Aminvest Companies, rather it represents a client, Hawazan S.A., one of the corporate share holders of the Aminvest Companies.

7. The Aminvest Companies have three directors: Mr. Rohlfs, who was previously described; Mr. Charles Olson; and Mr. Kim Semiao. Like Mr. Rohlfs, Mr. Olson is also employed by Dearborn. As a consequence, Mr. Rohlfs and Mr. Olson, as two of the three directors of the Aminvest Companies, have majority control of the Aminvest Companies, and, hence, the Debtor.

8. With this structure, the actual operations of the Debtor are managed. Property One, a local property management company, holds the exclusive leasing agreement on the office tower. Mr. James Ridgely oversees the daily operation and maintenance of the Debtor's property, as well as the leasing of the Debtor's retail shopping area. Kathryn Rosenblum heads the marketing department. Derek Thomas

heads the accounting and financial departments.

9. Mr. Rohlfs, when called to testify, could not name the various persons who were the individual shareholders of the Aminvest Companies. The best Mr. Rohlfs could state was that representatives of the various corporate shareholders are located in foreign countries, including Saudi Arabia, Liechtenstein and Luxembourg.

10. Given this maze of corporate partnerships, corporations, corporate shareholders and indirectly hired personnel to manage the Debtor, the Court finds the various persons who are the ultimate investors in the Debtor aspire to have their true identity concealed.

### The Debtor's Assets

11. The properties owned by the Debtor are listed as follows:

a. Phase I ("Phase I") of the Canal Place project is located in New Orleans, Louisiana, and is commonly known as the Canal Place Office Tower. Phase I includes the retail shopping mall and the Pledged Leases. The Debtor has estimated the fair market value of Phase I, to be $17 million.[1]

b. Phase II ("Phase II") of the Canal Place project, including the Westin Hotel, a multi-level parking garage, and those portions of the retail shopping mall not located in Phase I. The Debtor estimates the fair market value of Phase II to be $44 million.

c. Phase III ("Phase III") includes two outdoor parking lots of the Debtor, excluding the Iberville Building. The Debtor estimates the fair market value of these properties to be $6,783,000.

d. 111 Rue Iberville (the "Iberville Building"), which is a small office building located next to Phases I and II used by the Debtor for its offices. The Debtor estimates this property to have a fair market value of $750,000.

e. eight used motor vehicles for which the Debtor gives a cost value of $150,000.

f. all accounts receivable generated by the Westin Hotel operations of Phase II. The Debtor estimates these accounts receivable to have a cash value of $2.9 million.

g. cash on hand which the Debtor estimates to be $3.6 million.

h. a certificate of deposit in the amount of $6 million held by Bank of Credit & Commerce ("BCCI").

i. all furnishings and art work, which the Debtor estimates to have a cost value of $765,000.

j. other miscellaneous property, including claims of the Debtor against third parties.

### Claims against the Debtor

12. Aetna holds a secured claim against Phase I in the approximate amount of $38 million. Aetna's claim is secured by a first mortgage lien and a pledge of leases and rents therefrom. Aetna's claim is a non-recourse claim under the pertinent loan documents.

13. Travelers has a secured claim in the approximate amount of $153 million. This claim is secured by, among other things, a first mortgage lien against Phase II, as well as a pledge of the leases and rents therefrom, together with a second mortgage lien against Phase I and second pledge of the leases and rents therefrom. Travelers's claim is a non-recourse claim under the pertinent loan documents.

14. Harris Mortgage Company ("Harris") and BCCI hold other secured claims. Harris's claim is in the amount of $475,000 and is secured by a first mortgage lien against 111 Rue Iberville. The claim of BCCI is $7,824,462, plus a contingency claim on a letter of credit issued by BCCI of $2,650,000, and is secured by the $6 million letter of credit mentioned above as well as a first mortgage lien against Phase III and a second mortgage lien against 111 Rue Iberville.

15. The Debtor's schedules show certain unsecured claims in the amount of

---

**1.** According to the Debtor, the properties' fair market value represents a value after capital contributions are made by the Debtor. The capital contributions are discussed *infra*.

$2,784,757. This amount includes claims held by various companies related to the Westin Hotel. In addition, the Westin Hotel may have unsecured claims in the disputed total amount of $11 million, which is a recourse claim. However, according to the testimony of Mr. Rohlfs, the Debtor believes that it has valid objections to the Westin claim which will be sustained by the Court.

16. According to the Debtor, it is indebted to local taxing authorities in the approximate amount of $4 million. The 1990 real estate taxes for all of the Debtor's property is approximately $2.2 million, none of which has been paid. The real estate taxes for 1989 are also approximately $2.2 million, of which only about $670,000 has been paid.

17. Considering the foregoing, the Court finds that the Debtor has equity in 111 Rue Iberville and Phase III. Based upon the values for 111 Rue Iberville and Phase III set forth in the disclosure statement, and subtracting therefrom the secured claims of Harris and BCCI against these properties (after first subtracting from these secured claims the $6 million certificate of deposit securing same), it would appear that there is equity in 111 Rue Iberville and Phase III over and above the claims of Harris and BCCI (after first subtracting the certificate of deposit) of between $5,233,539 and $2,583,539, depending upon whether or not the contingency claim of BCCI is also included. Other sources besides the equity in 111 Rue Iberville and Phase III from which the unsecured claims of the debtor can be paid would include available unencumbered cash on hand, the motor vehicles of the debtor, and claims of the debtor against others.

*The Debtor's Plan of Reorganization*

18. According to the Debtor, the Plan generally provides for the issuance of two letters of credit, the modification of the loan documents, the payment of prepetition debts, and the retention or sale of the estate's property by the Debtor.

19. The Plan requires the partners of the Debtor to obtain the issuance of two letters of credit (collectively "the Letters of Credit") for the benefit of the Debtor in implementing the Plan. The Letters of Credit are more fully described as follows:

a. The "Capital Improvements Letter of Credit" is to be established in the amount of $4.7 million to fund expenses associated with the continued, post confirmation leasing of Phase I and Phase II.

b. The "Irrevocable Letter of Credit" is to be established in the amount of $13.7 million to fund, among other expenses, any shortfalls in the cash flow necessary to fund operations and the restructured, post-confirmation debts owed to Aetna and the Debtor. This letter of credit expires five years after the effective date of the plan.

According to the written terms of the Plan, the chief executive officer will have absolute discretion in making draws against the Letters of Credit. According to Mr. Rohlfs's testimony at the hearing, the written terms of the Plan overstate the Debtor's true intent that the chief executive officer act prudently within the spirit of achieving the Plan's goals.

20. According to the testimony of Mr. Rohlfs, he has been assured by the shareholder representatives of the undisclosed principals that the necessary steps to fund and obtain the issuance of the Letters of Credit will be taken. Mr. Rohlfs assures the Court that he has held discussions with Banque Contrade de Lausanne and received assurances the Letters of Credit would be funded no later than the hearing on the Debtor's Disclosure Statement, if the Court so required.

21. In addition to the issuance of the Letters of Credit, the Plan provides specific treatment for ten classes of claims. The Court will only discuss those classes which are especially relevant for the instant motion. Classes One, Two, and Three involve the claims of Aetna and Travelers, and the modification of their loan documents. Classes Seven and Eight represent the holders of unsecured claims. Classes Nine and Ten represent the Debtor's partners.

22. For classes One, Two, and Three, the Debtor has determined the values of Phase I and Phase II based upon 1992 operating revenues capitalized at an eleven and one-half percent rate.

23. Under Classes One through Three, the Plan proposes to create secured claims of Aetna and Travelers totaling $61 million. The difference between the total claims of Aetna and Travelers ($191 million ($38 + 153)) and the proposed secured claim under the Plan ($61 million), or the sum of $130 million, would be treated as unsecured claims under the Debtor's proposed plan assuming neither Aetna nor Travelers makes the election under 11 U.S.C. § 1111(b)(2).

24. The Plan proposed to pay the secured claims of Aetna and Travelers totalling $61 million over a 25 year term, in the case of Aetna, and over a 32 year term, in the case of Travelers, both at a rate of 10.5% interest. The Debtor acknowledged that, in the current New Orleans real estate market, no such loan by a willing lender would ever be made.

25. The Debtor proposes to pay Class Three under the Plan, comprising the $130 million of unsecured claims, by paying Aetna and Travelers 58% of the net revenues generated only by the new leases of the Debtor entered into after confirmation. The other 42% to be paid directly to the Debtor to cover its operating expenses.

26. Additionally, the Plan provides that the Debtor can sell Phases I and II to another entity, whether or not such new entity is owned by the same principals who own the Debtor, and that upon any such sale the Class Three Claims of Aetna and Travelers are satisfied in full by the payment of any net sales proceeds in excess of $61 million. The Plan, by its specific terms, further allows a purchaser of Phases I and II to assume the restructured secured debt of Aetna and Travelers totalling $61 million.

27. If under the Plan, Aetna makes the election pursuant to 11 U.S.C. § 1111(b)(2), Aetna will receive payments over twenty-five years in an amount equal to $38 million at an interest rate of one percent. The Debtor claims this is the equivalent to the present value of their claim. Should Travelers make the election, Travelers will receive payments over thirty-two years at zero interest. The Debtor claims that this equals the present value of Travelers' claim.

28. Class Seven includes all allowed unsecured claims in excess of $5000, including the claims of the Westin Hotel. The Debtor proposes to pay a lump sum cash payment equal to twenty percent of the holder's claim. Class Eight includes all allowed claims of $5000 or less. A member of Class Eight will receive a lump sum cash payment equal to ninety percent of its claim.

29. Classes Nine and Ten include all the claims and interests of the general and limited partners. Under the Plan, the partners would retain their ownership interest in the Debtor.

### The Debtor's History Prior to the Bankruptcy Proceeding

30. Since the Debtor's formation, it has always suffered recurring losses.

31. The primary lender was willing to make substantial concessions before the Debtor filed its bankruptcy proceeding. As detailed more fully hereinafter, Travelers repeatedly modified the terms of the original loan, at the request of Canal Place, in an effort to accommodate the borrower's continued and escalating cash flow deficiencies. The terms of these modifications demonstrate Canal Place's unresolved cash flow difficulties. *See* Travelers' Exs. 3, 13, 16, and 18.

32. The original Travelers' promissory note (the "Note"), executed on December 14, 1984, provided for the accrual of interest at a fixed per annum rate that increased once every twelve months (the "Contract Rate"). The beginning Contract Rate was 13.1577% for 1985, with an ending rate in 1988 of 13.8567%. Under the Note, Canal Place was never obligated to make monthly installments of more than a partial interest payment at the Contract Rate. These partial payments of interest

are referred to as the "Pay Rate(s)." There was no obligation under the Note to begin repaying any of the principal amount until it matured on January 1, 1989. Furthermore, the deferred interest (the difference between the Contract Rate and the actual Pay Rate) did not accrue interest and was not payable until the maturity of the Note in 1989. Travelers' Ex. 3, Sections 1, 2, and 3.

33. Less than one and one-half years after the original Note was executed, Travelers agreed to grant Canal Place a concession in the Pay Rate and the Secured Promissory Note was amended on May 1, 1986 (the "First Amendment"). In the First Amendment, Travelers agreed to reduce the Pay Rate, and thereby increase the amount of deferred interest, for a twelve month period (beginning on February 1, 1986), in the aggregate amount of $575,000 or approximately $48,000 per month. Travelers also agreed the additional deferred interest would only bear interest at the per annum rate of 8¾%. *See* Travelers' Ex. 13, p. 3, Section A.

34. On December 19, 1986, less than seven months after the First Amendment, the parties executed yet another amendment to the Note (the Second Amendment). In the Second Amendment, Travelers agreed to reduce dramatically the Pay Rate for two twelve-month periods. Beginning February 1, 1987, Canal Place's Pay Rate was reduce by $335,416 per month or approximately $4,025,000 for the year 1987. A similar reduction was made for 1988. Once again, the parties agreed that the additional deferred interest for these years would only bear interest at the per annum rate of 8¾%. *See* Travelers' Ex. 16, p. 3, Section B.

35. In addition to Travelers' agreement to defer over $8,000,000 in payments, less than nine months after finalizing the Second Amendment, Travelers again agreed to grant Canal Place concessions. Finalized on September 30, 1987, the Third Amendment to the Secured Promissory Note (the "Third Amendment") not only extended the

maturity date of the Note from 1989 to 1992, but lowered the Pay Rate and substantially lowered the Contract Rate. Travelers' Ex. 18, Sections 1–3).

36. Despite these concessions, the Debtor found it necessary to seek protection under bankruptcy law.

37. On February 5, 1990, just sixteen days before the Chapter 11 proceeding was filed, the Debtor authorized a questionable wire transfer of $326,500 from a tax escrow account held for the benefit of Aetna at the Chemical Bank in New York City to an account of a local law firm. Mr. Rohlfs testified that the transfer was made to pay retainers to the Debtor's bankruptcy counsel and with the expectation that the funds were placed beyond the reach of seizing creditors.[2]

### The Debtor's Present and Proposed Operations While Under Bankruptcy Protection

38. As mentioned above, the Debtor filed for bankruptcy protection on February 21, 1990.

39. At a preliminary conference, the Court admonished the Debtor to have written commitments for the Letters of Credit it was seeking. The Court directed that such commitments be made subject to appropriate conditions and that the commitments would be obtained before the hearing on Aetna's and Travelers' motions to lift the stay. At the hearing, Mr. Rohlfs acknowledged the Letters of Credit had not been formally placed.

40. In addition to the funding Letters of Credit, Mr. Rohlfs also testified concerning the Debtor's projected future earnings. As explained by Mr. Rohlfs, the combination of the new CNG Tower, the recent pullout of Amoco from New Orleans, and other existing vacant space in other major office buildings, including Place St. Charles, has created approximately 1.855 million square feet of office space available for rental, all of which is competing with the Canal Place project for the same tenants. The Court agrees and finds the market in New Or-

---

2. The Court expresses no opinion as to the final disposition of these funds, including whether or not those funds, or some portion thereof, will be returned to the bankruptcy estate.

leans for the rental of office space is very weak at the present time. According to Mr. Rohlfs, he believes there will be a further decrease in the occupancy of both Phases I and II due in part to the continuing downward movement in the New Orleans economy. In addition, Mr. Rohlfs projects Phase I will require a significant cash outlay for needed renovations to the public areas. Although the Debtor is engaged in discussions with prospective tenants, Mr. Rohlfs acknowledged that the Debtor has been unable to obtain any commitments to lease additional space at Canal Place.

41. According to the Debtor's own projections, developed from the Debtor's financial history, the operating revenues from Phases I and II are not sufficient to service the reduced and restructured secured debt of $61 million for Aetna and Travelers under the Plan. For the remainder of 1990 according to the Debtor's projections, the deficiency in the Debtor's ability to service that debt from operating revenues will be about $4.8 million, and such deficiency will be about $5.7 million for 1991 and $2.8 million for 1992. In all, the deficiency through December 31, 1992 under the Debtor's Plan using its own projections will be $13.3 million.

42. Finally, it should be noted that the Debtor filed its disclosure statement and plan just three days before the hearing on the lift stay. Although this was done within the exclusivity period, the Court finds the Debtor's primary purpose was not to expedite this bankruptcy reorganization, but rather to prolong it. The Debtor was simply trying to place form over substance in the hope the Court would be obliged to deny the motions to lift the stay and set the Plan for a confirmation hearing or, at the very least, after another delay, entertain an expedited motion to dismiss or convert. It is also worthy to note that the hearing on these motions to lift stay was presented to the Court by skilled bankruptcy practitioners and was conducted with all the formality which would have attended a trial on an adversary complaint.

## Conclusions of Law

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 362. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(G). This matter was referred to the Court pursuant to the Standing Order of Reference.

2. The filing of a bankruptcy petition operates automatically to stay a secured creditor from foreclosing on its collateral. 11 U.S.C. § 362(a)(5).

3. If a secured creditor desires relief from the automatic stay, it may proceed under § 362(d), which provides, in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . .
>
> (1) for cause, including the lack of adequate protection . . .
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> > (a) the debtor [lacks] equity in such property; and
> >
> > (b) such property is not necessary for an effective reorganization.

4. In every case where a creditor seeks relief under § 362(d)(2), the creditor has the burden to establish the lack of equity in the property and the debtor has the burden to establish that the property is necessary for an effective reorganization. 11 U.S.C. § 362(g). *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). As a leading bankruptcy treatise has stated, "The reference to an 'effective' reorganization should require relief from the automatic stay if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations." 2 *Collier on Bankruptcy* ¶ 362.07 at 362–62. On this issue, the debtor bears the risk of non-persuasion.

5. In the case at hand, the Debtor has stipulated it has no equity in Phases I and II. According to the Debtor's own Plan,

Aetna and Travelers have unsecured claims in the amount of $130 million.

6. The Debtor argues that it has filed a plan within the exclusivity period and should be afforded an opportunity to seek confirmation without termination of the automatic stay. The Debtor maintains it should not be required to prove the feasibility of its Plan under those same standards required at a confirmation hearing. Accordingly, the Court should construe the Plan in the light most favorable to the Debtor and allow it to proceed to a confirmation hearing.

■ 7. In deciding whether or not to lift the stay, a majority of courts which have addressed the issue of an "effective reorganization" require a showing of a reasonable prospect for a successful reorganization within a reasonable time before allowing the stay to remain in effect. *See Timbers of Inwood Forest Assocs., Ltd.,* 808 F.2d 363, 370 (5th Cir.1987) (en banc), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization. *Id.* at 371.

8. In *Timbers,* the Fifth Circuit, sitting en banc, squarely addressed the issue of whether or not undersecured creditors were entitled to postpetition payments as a form of adequate protection. Nonetheless, in its analysis, the Fifth Circuit discussed "important creditor-protection provisions" of the Code and "the need for protecting the debtor's right to reorganize," in particular in the context of the lifting of the automatic stay. *Id.* at 370 and 373. Speaking to its bankruptcy courts, the Fifth Circuit instructed that "[e]arly and ongoing judicial management of Chapter 11 cases is essential" and that the "key to avoid excessive administrative costs, which are borne by the unsecured creditors, as well as excessive interest expense, which is borne by all creditors, is early and stringent judicial management of the case." (footnotes omitted) *Id.* at 373. The Fifth Circuit noted that the vast majority of Chapter 11 cases do not end with confirmed plans of reorganization. Therefore, the challenge to the bankruptcy court is to recognize these cases as promptly as possible and limit the administrative expenses and costs borne by the creditors. *Id.* at 373, n. 17.

9. As such,

[w]hen there is no reasonable likelihood that the statutory objective or reorganization can be realized or when the debtor unreasonably delays, then the automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interest of creditors, the intended beneficiaries. In that situation it is incumbent upon the bankruptcy judge to effectuate the provisions of the Bankruptcy Code for the protection of the creditors.... The bankruptcy judge must meet head-on his obligation to decide, fairly and impartially, the hard questions.

*Id.* at 373.

■ 10. Having carefully reviewed the Plan and having observed this entire proceeding, the Court is convinced that the implicit objective of the Plan is to delay foreclosure by Aetna and Travelers until the Debtor can either sell Canal Place or wait for the return of the favorable office and retail market. As such, the Plan only benefits the partners of the Debtor and is detrimental to Aetna, Travelers, and the unsecured creditors. Given the motives and consequence of the proposed Plan, the Debtor has failed to carry its burden of persuasion that there is a reasonable prospect for a successful reorganization. In the Court's opinion, the Plan is simply not feasible on its face.

11. Mr. Rohlfs testified, and the Court also agrees, that the Canal Place real estate venture has been unable to service its secured debt since its inception. As a consequence, any entity who ultimately controls Canal Place must either pay the $130 million unsecured debt, suffer its loss, or attempt to have it discharged.

12. The Plan in its present form allows the Debtor five years to sell or wait for the market to turn upward. According to the Debtor's own calculations, it could service

Aetna's and Travelers' secured debt during that time with draws on its Irrevocable Letter of Credit. After any draw, of course, the Debtor's partners will be entitled to an added return of interest since their credit has been called. To repay the $130 million in unsecured debt, the Debtor is only obliged under the Plan to pay 58% of its income from the new leases written post-confirmation. If the Debtor does not write any new leases, then Aetna and Travelers will be entitled to a pro rata distribution of 58% of zero. All the while, the Plan, under its specific written terms, allows for the sale of Phases I and II with the purchaser assuming the restructured debt of Aetna and Travelers. This is an added benefit for the Debtor since future purchaser may be attached to the more favorable loan terms. In all, the undisclosed partners of the Debtor are risking $18.4 million against the $191 million debt until a possible sale or upturn in the market.

13. The Bankruptcy Code cannot be used to protect the interests of the Debtor's undisclosed principals. "It has long been recognized that using the bankruptcy process to promote individual interests in a manner not consistent with the legislative purposes of the Bankruptcy Code is an abuse of the jurisdiction of the bankruptcy courts." *Basin Electric Power Coop. v. Midwest Processing Co.*, 47 B.R. 903, 909 (D.N.D.1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985). Because of the numerous elements of Debtor's proposed Plan which benefit only the investors, this Court determines that the Plan prejudices the rights of creditors, while allowing only the Debtor's unidentified principals an opportunity to salvage their investments. As such, continuing this case would benefit primarily the unidentified investors and insiders and may therefore constitute an abuse of the bankruptcy process.[3]

14. Despite the Debtor's effort to retain Phases I and II, the Court concludes that the return realized by the Debtor's

unsecured creditors will be enhanced if Aetna and Travelers are allowed to foreclose their mortgages against Phases I and II. The claims of Aetna and Travelers are non-recourse as to the debtor. Accordingly after a foreclosure of Phases I and II Aetna and Travelers would not retain any deficiency unsecured claims against the Debtor. *See Tampa Bay Assoc., Ltd. v. DRW Worthington, Ltd.*, 864 F.2d 47 (5th Cir. 1989). Hence, if Aetna and Travelers are allowed to foreclose their liens, $130 million of Class 3 unsecured claims will vanish from any plan proposed by the Debtor. Therefore, the Court concludes that the unsecured creditors have a much better chance of being paid if the unsecured claims of Aetna and Travelers totaling $130 million were removed from this proceeding.

15. On the other hand, under any plan of reorganization if Aetna and Travelers are not allowed to foreclose on their non-recourse mortgages, their deficiency unsecured claims of Aetna and Travelers totaling $130 million are recognized under 11 U.S.C. § 1111(b) and must be treated accordingly in any plan of the Debtor. Based on the estimated values of 111 Rue Iberville and Phase III, the Court concludes that there is a substantial probability that the unsecured creditors will receive as much as 100% of their claims and, in any event, will receive more if Aetna and Travelers are removed from any plan.

16. Finally, if Aetna and Travelers are allowed to foreclose on their non-recourse mortgages, the unsecured creditors will be spared the cost of excessive administrative expenses. If the Court were to allow the Debtor's reorganization to continue with its present and deficient plan, the unsecured creditors would be no better off. In fact, the expenses of the Debtor's preparation for the hearings on its Disclosure Statement and Plan and the resulting delay would be costs needlessly borne by the unsecured creditors. Given the Debtor's

---

**3.** The Court is mindful that plans of reorganization often consider a favorable sale of the going concern or waiting for market conditions to improve. However, the Bankruptcy Code does not contemplate that a plan of reorganization be proposed only to benefit the individual investors at the great expense of secured and unsecured creditors.

Plan and the reasons expressed herein, the Court cannot justify this further expense to the unsecured creditors.

17. Accordingly, the Court finds that, not only are Phases I and II unnecessary to an effective reorganization of the Debtor, but also that a lifting of the stay as to Aetna and Travelers, thereby removing their unsecured claims from this proceeding, is necessary to any effective reorganization for the Debtor.

■ 18. According to the Debtor, its plan will be funded, in large part, from the Debtor's operating revenues. When operating revenues fund a plan, a debtor's past and present financial records are probative of the plan's feasibility. *In re Hobble–Diamond Cattle Co.*, 89 B.R. 856, 858 (Bankr. D.Mont.1988). This Court finds that Debtor has repeatedly sought and received concessions from its primary lender, yet never could generate a sufficient cash flow to maintain debt service.

19. Debtor's prior performance is probative of the feasibility of any plan of reorganization, especially where the primary lender has worked closely with Debtor to restructure the debt to allow greater cash flow. *Hobble–Diamond*, 89 B.R. at 858. Speculative, conjectural or unrealistic projections by Debtor cannot support Debtor's predictions of future performance. *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass.1983). Because Debtor could not demonstrate that its prospects of effective reorganization are well-founded at the hearing on the motion for relief from stay and because of Debtor's prior inadequate performance, this Court concludes that the stay should be lifted under 11 U.S.C. § 362(d)(2).

20. In determining whether Phase I and Phase II are necessary for an "effective" reorganization of the Debtor, the Court is imposing a "feasibility" standard; applying this standard, this Court finds that the Debtor does not have a reasonable possibility of successful reorganization in reasonable time. *See Timbers*, 808 F.2d at 370–71; *In re 8th Street Village Ltd. Partnership*, 94 B.R. 993, 996 (N.D.Ill.1988).

21. The Debtor's financial history indicates that it cannot generate sufficient funds to pay normal operating expenses and satisfy its obligations under any proposed plan of reorganization. Accordingly, even without the necessity of reviewing any plan of reorganization submitted by Debtor, this Court concludes that Debtor cannot feasibly reorganize in a reasonable time period.

■ 22. Finally, the Court concludes that the stay should be lifted "for cause" under 11 U.S.C. § 362(d)(1) for the following reasons. The structure of the Debtor is such that the Court does not know with whom it is dealing, and the Debtor has refused to disclose the names of its individual principal investors. This concern of the Court's is only heightened given that the Debtor could not timely produce the commitments to fund the Letters of Credit as directed by the Court. Additionally, the Court does not believe it is in the best interest of creditors for the Debtor to be operated by an individual who has no ownership interest in it and receives no compensation from the Debtor for his services. It is also clear that Mr. Rohlfs believes he owes a fiduciary duty to the individual investors in the Debtor who he will not name, and the Court concludes that Mr. Rohlfs' first loyalty is to the clients of Dearborn, his employer, rather than to the creditors of the Debtor. Combined with the manner in which the debtor dealt with the Aetna tax escrow account at Chemical Bank, the admittedly very soft market for office space in New Orleans, and the fact that this Debtor has always had losses since its inception, the Court concludes that cause exists to lift the stay and to allow Aetna and Travelers to foreclose their mortgages. In summary, this Court's evaluation of the Debtor's financial condition, motives for filing the Chapter 11 proceeding, and the local financial realities lead to a finding of "cause" to lift the stay. *See In re Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir.1986).

For these reasons, the Court will enter an order lifting the stay and allowing the

Aetna and Travelers to foreclose on Phase I and II.

New Orleans, Louisiana, this 29th day of June, 1990.

/s/ T.H. Kingsmill, Jr.
T.H. KINGSMILL, JR.
U.S. BANKRUPTCY JUDGE